[No. A096658. First Dist., Div. One. Sept. 25, 2002.]

THE GOVERNOR GRAY DAVIS COMMITTEE, Plaintiff and
Respondent, v.
AMERICAN TAXPAYERS ALLIANCE, Defendant and Appellant.

450

452

**COUNSEL**

Crosby, Heafey, Roach & May, Kathy M. Banke; Webster, Chamberlain & Bean, Alan P. Dye, Heidi K. Abegg; Bopp, Coleson & Bostrom and James Bopp for Defendant and Appellant.

Remcho, Johansen & Purcell, Joseph Remcho and James C. Harrison for Plaintiff and Respondent

## OPINION

**SWAGER, J.**—The trial court denied appellant's special motion, under Code of Civil Procedure section 425.16,[1] to strike respondent's action for injunctive relief and granted respondent's request for a preliminary injunction. We conclude that the causes of action alleged against appellant arise from acts taken by appellant in furtherance of its right to free speech and that respondent failed to show a probability of success on the merits due to appellant's constitutional defense to the action. We reverse the judgment.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Appellant American Taxpayers Alliance (hereafter ATA or appellant) is a nonprofit corporation which was ostensibly organized to "engage in legislative activities" on "issues that affect the American taxpayer," primarily revision of the Social Security system. In June of 2001, the ATA financed the production and presentation of a television advertisement that was patently critical of the management of "California's energy problems" by Governor Gray Davis, who was then a candidate for reelection in 2002. The advertisement presents blurred film of Governor Davis, and other darkened, obscure visual images. The audio portion consisting of a single voice accuses Governor Davis of "pointing fingers and blaming others" to avoid responsibility for the energy crisis that "left us powerless," but points out that the Public Utilities Commission, which is controlled by "Davis appointees," "blocked long-term cost-saving contracts for electricity." After attributing to newspapers the assessment that Governor Davis "ignored all the warning signals and turned a problem into a crisis," the advertisement closes with the words, "Gray outs from Gray Davis," as a light bulb is turned off.

---

[1]All further statutory references are to the Code of Civil Procedure unless otherwise indicated. In 1992, the California Legislature enacted section 425.16, a provision commonly known as the " 'anti-SLAPP statute.' " (*Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 264 [105 Cal.Rptr.2d 674]; Stats. 1992, ch. 726, § 2, p. 3522.) "SLAPP is an acronym for Strategic Lawsuit Against Public Participation. SLAPP litigation, generally, is litigation without merit filed to dissuade or punish the exercise of First Amendment rights of defendants." (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 858 [44 Cal.Rptr.2d 46].)

Text at the bottom of the ad reads: "Paid for by American Taxpayers Alliance."[2]

On July 20, 2001, The Governor Gray Davis Committee (hereafter respondent), filed a complaint for injunctive relief against the ATA, along with a motion for a preliminary injunction. The complaint alleges the ATA violated the reporting provisions of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.). Respondent alleges in the complaint that the "campaign-style television ad" produced by the ATA "has no purpose other than to denigrate Governor Davis," and "unambiguously urges" his "defeat in 2002." The action seeks to enjoin further violations of the Political Reform Act and compel the ATA's compliance with the specific statutory obligations to file a statement of organization (Gov. Code, § 84101) and a semiannual campaign statement disclosing contributors (Gov. Code, § 84200).

Appellant subsequently filed a special motion to strike the complaint pursuant to section 425.16. The trial court denied appellant's motion to strike and granted respondent's motion for preliminary injunction. This appeal followed.

### Discussion

Appellant argues that the trial court erred by denying its special motion to strike, and abused its discretion in granting respondent's motion for a preliminary injunction. Appellant maintains that respondent's lawsuit is a "classic SLAPP suit," designed to restrain "constitutionally protected" speech.

Since its enactment, section 425.16 has spawned numerous appellate cases arising from various factual contexts that were perhaps never envisioned by George W. Pring and Penelope Canan, the two University of Denver professors who coined the expression "SLAPP suit."[3] (See generally Canan & Pring, *Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches* (1988) 22 Law & Soc'y Rev. 385.) However, the complaint before us clearly raises issues that fall within the ever widening haven of the SLAPP statute.

---

[2]The full audio portion of the advertisement states: "He's pointing fingers and blaming others—Gray Davis says he's not responsible for California's energy problems. After all, the Public Utilities Commission blocked long-term cost-saving contracts for electricity. But who runs the PUC? The people Gray Davis appointed—Loretta Lynch and other Davis appointees who left us powerless. That's why newspapers say Davis ignored all the warning signals and turned a problem into a crisis. Gray outs from Gray Davis."

[3]"[S]ection 425.16 was enacted in 1992 to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235 [83 Cal.Rptr.2d 677].)

Under section 425.16, "[w]hen a lawsuit arises out of the exercise of free speech or petition, a defendant may move to strike the complaint." (*Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 949 [52 Cal.Rptr.2d 357].) Subdivision (b)(1) of section 425.16 provides in pertinent part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." In order to encourage participation in matters of public significance, section 425.16 specifies in subdivision (a) that the statute "shall be construed broadly." In *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1121-1122 [81 Cal.Rptr.2d 471, 969 P.2d 564], our high court noted "that the broad construction expressly called for in subdivision (a) of section 425.16 is desirable from the standpoint of judicial efficiency . . . ."

■ Section 425.16 articulates a "two-step process for determining whether an action is a SLAPP." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703]; see also *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1364 [102 Cal.Rptr.2d 864].) " 'First, the court decides whether the defendant has made a threshold prima facie showing that the defendant's acts, of which the plaintiff complains, were ones taken in furtherance of the defendant's constitutional rights of petition or free speech in connection with a public issue. [Citation.] If the court finds that such a showing has been made, then the plaintiff will be required to demonstrate that "there is a probability that the plaintiff will prevail on the claim." [Citations.] The defendant has the burden on the first issue, the threshold issue; the plaintiff has the burden on the second issue. [Citation.]' [Citation.]" (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928 [116 Cal.Rptr.2d 187]; see also *Paul v. Friedman* (2002) 95 Cal.App.4th 853, 862-863 [117 Cal.Rptr.2d 82].) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten, supra,* at p. 89.)

■ On appeal we review independently whether the complaint against the appellant arises from appellant's exercise of a valid right to free speech and petition and if so, whether the respondent established a probability of prevailing on the complaint. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625].)

## I. *The Requirement of an Act in Furtherance of the Right of Free Speech.*

 We first determine if the defendant has met the burden of showing that the causes of action arise from protected activity. (*Kajima Engineering & Construction, Inc. v. City of Los Angeles, supra,* 95 Cal.App.4th 921, 928; see also *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1089 [114 Cal.Rptr.2d 825].) "When moving to strike a cause of action under the anti-SLAPP statute, a defendant that satisfies its initial burden of demonstrating the targeted action is one arising from protected activity faces no additional requirement of proving the plaintiff's subjective intent. [Citation.] Nor need a moving defendant demonstrate that the action actually has had a chilling effect on the exercise of such rights." (*Navellier v. Sletten, supra,* 29 Cal.4th 82, 88, citing *Equilon Enterprises, LLC v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].)

Section 425.16 applies to a cause of action arising from an act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue. (§ 425.16, subd. (b)(1).) Subdivision (e) of section 425.16 defines "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" to include: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

 "[T]he statutory phrase 'cause of action . . . arising from' [in section 425.16, subdivision (b)(1),] means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695]; *Kajima Engineering & Construction, Inc. v. City of Los Angeles, supra,* 95 Cal.App.4th 921, 928-929; *Chavez v. Mendoza, supra,* 94 Cal.App.4th 1083, 1090.)

"The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish [his or] her actions are constitutionally protected under the First Amendment as a matter of law." (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305 [106 Cal.Rptr.2d 906].) "Instead, under the statutory scheme, a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary. [Citation.] Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens." (*Chavez v. Mendoza, supra*, 94 Cal.App.4th 1083, 1089-1090.)

 Respondent argues that appellant failed to make the necessary "threshold showing" of actions "taken in furtherance of ATA's constitutional rights of petition or free speech in connection with a public issue." Respondent's position is that the underlying suit was brought to dispute and enjoin appellant's "failure to file campaign statements" in violation of the Political Reform Act, not to "chill ATA's speech" or the "right to sponsor the ad." Thus, respondent asserts that without any challenge to the right of free speech, "ATA's illegal conduct is not protected by section 425.16."

To support the argument that "section 425.16 does not protect violations of the Political Reform Act," respondent directs our attention to *Paul for Council v. Hanyecz, supra*, 85 Cal.App.4th 1356, 1362. There the plaintiff filed a complaint against the defendants for violation of the act based upon their acts of "laundering campaign money" for one of his opponents in the local election for city council. In support of their SLAPP motion, defendants acknowledged they "in fact did violate the Political Reform Act when they laundered campaign contributions to persons running for local and state offices," (*id.* at p. 1361) but nevertheless argued that "their campaign money laundering activity was taken '*in furtherance*' of their constitutional right of free speech, and therefore such activity comes within the parameters of section 425.16's protection, even though such activity was found to be illegal." (*Id.* at p. 1366.)

The court in *Paul* proceeded from the premise that, "The making of a political campaign contribution is a type of political speech. 'A contribution serves as a general expression of support for the candidate and his views . . . .' [Citations.]" (*Paul for Council v. Hanyecz, supra*, 85 Cal.App.4th 1356, 1365-1366.) " ' "[T]he constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." ' [Citation.] 'Thus, those engaged in political debate are

entitled not only to speak responsibly but to ". . . speak foolishly and without moderation." [Citation.]' [Citation.]" (*Beilenson v. Superior Court, supra,* 44 Cal.App.4th 944, 949-950.)

However, the *Paul* court found no need to address the second step of a section 425.16 analysis because it found "*as a matter of law,* that defendants cannot meet their burden on the first step." (*Paul for Council v. Hanyecz, supra,* 85 Cal.App.4th 1356, 1365.) Addressing the conceded violations of the Political Reform Act, the court concluded: "Under the facts demonstrated by this record, we cannot permit defendants to wrap themselves in this vital legislation. Thus, while it is technically true that laundering campaign contributions is an act in furtherance of the giving of such contributions, that is, in furtherance of an act of free speech, we reject the notion that section 425.16 exists to protect such illegal activity. Section 425.16 protects a defendant 'from retaliatory action for his or her exercise of legitimate . . . rights . . . .' [Citation.]" (*Id.* at p. 1366, italics omitted.) However, the court added the caveat: "This case, as we have emphasized, involves a factual context in which defendants have effectively conceded the illegal nature of their election campaign finance activities for which they claim constitutional protection. Thus, there was no dispute on the point and we have concluded, as a matter of law, that such activities are *not* a valid exercise of constitutional rights as contemplated by section 425.16. . . . [¶] . . . If the plaintiff contests this point, and unlike the case here, cannot demonstrate as a matter of law that the defendant's acts do not fall under section 425.16's protection, then the claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise and support in the context of the discharge of the plaintiff's burden to provide a prima facie showing of the merits of the plaintiff's case." (*Id.* at p. 1367, italics omitted.)

Here in contrast, appellant neither has conceded nor does the evidence conclusively establish the illegality of its communications made during the course of debate on political issues. (See *Brown v. Hartlage* (1982) 456 U.S. 45, 61 [102 S.Ct. 1523, 1533, 71 L.Ed.2d 732]; *Monitor Patriot Co. v. Roy* (1971) 401 U.S. 265, 271-272 [91 S.Ct. 621, 625, 28 L.Ed.2d 35]; *Beilenson v. Superior Court, supra,* 44 Cal.App.4th 944, 950-951.) Appellant claims its advertisement constitutes protected speech that cannot be regulated by the Political Reform Act, and consequently no violation of law occurred. Further, while respondent specifically seeks to enjoin violations of the Political Reform Act, not directly the television spot itself, the action still arises from purported acts in furtherance of the right of free speech associated with campaign contributions. (*Paul for Council v. Hanyecz, supra,* 85 Cal.App.4th 1356, 1365-1366.) Imposition of the disclosure requirements of the Political

Reform Act on appellant's conduct effects the fundamental right of political communication afforded under the federal and state Constitutions. (See *Buckley v. Valeo* (1976) 424 U.S. 1, 19, 39-51 [96 S.Ct. 612, 634-635, 644-650, 46 L.Ed.2d 659]; *Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 489 [71 Cal.Rptr.2d 606].)

Thus, with the legality of appellant's exercise of a constitutionally protected right in dispute in the action, the threshold element in a section 425.16 inquiry has been established. (*Chavez v. Mendoza, supra,* 94 Cal.App.4th 1083, 1089-1090; *Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548 [46 Cal.Rptr.2d 880].) The asserted violation of the Political Reform Act by appellant is an issue we must examine in the context of the discharge of the respondent's burden to construct a prima facie showing of the merits of its case. (*Paul for Council v. Hanyecz, supra,* 85 Cal.App.4th 1356, 1367.) ■ Finally, although, as respondent points out, appellant's advertising campaign apparently ran its course before the suit was initiated, "[c]laims that arise from a defendant's prior free speech or petition activities are subject to an anti-SLAPP motion regardless of whether the protected activities have concluded before the lawsuit was filed." (*Chavez v. Mendoza, supra,* at p. 1090.)

## II. *The Probability That Respondent Will Prevail on the Merits.*

Our conclusion that appellant has made a prima facie showing that the complaint arises from the exercise of its right to free speech leads us to the second part of the section 425.16 test, which places the burden on respondent to establish that there is a probability that it will prevail on its claims. ■ "In order to establish a probability of prevailing on the claim (§ 426.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must ' "state[] and substantiate[] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].) " 'The burden on the plaintiff is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment. [Citations.]' [Citation.] To make our determination, we consider 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' [Citation.] The motion to strike should be granted if, as a matter of law, 'the properly

pleaded facts do not support a claim for relief. [Citation.]' [Citation.]" (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 809 [119 Cal.Rptr.2d 108]; see also *Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 [84 Cal.Rptr.2d 303].)

The second step of our anti-SLAPP analysis requires us to examine the merits of respondent's claim that appellant's advertisement created an obligation to comply with the disclosure and reporting obligations of the Political Reform Act, particularly Government Code sections 84101 and 84200.[4] Our inquiry forces us to step into the maelstrom created by the clash between one of our most fundamental constitutional rights to freedom of expression, and the public's right to an electoral process that remains open and free from corruption.

To facilitate the stated objective of the Political Reform Act under Government Code section 81002, subdivision (a), "that '[r]eceipts and expenditures in election campaigns should be fully and truthfully disclosed in order that [the] voters may be fully informed and improper practices may be inhibited[,] . . . the Act requires political candidates and campaign committees to file written reports of election expenditures made and contributions received." (*McCauley v. BFC Direct Marketing* (1993) 16 Cal.App.4th 1262, 1267 [20 Cal.Rptr.2d 498]; see also *League of Women Voters v. Countywide Crim. Justice Coordination Com.* (1988) 203 Cal.App.3d 529, 550 [250 Cal.Rptr. 161].) ■ "The manifest purpose of the financial disclosure provisions of the Act is to insure a better informed electorate and to prevent corruption of the political process." (*Thirteen Committee v. Weinreb* (1985) 168 Cal.App.3d 528, 532 [214 Cal.Rptr. 297].)

The act mandates that expenditures be reported once specified monetary thresholds are reached. (Gov. Code, § 82013, subd. (b); *Yes on Measure A v. City of Lake Forest* (1997) 60 Cal.App.4th 620, 623 [70 Cal.Rptr.2d 517].) Under Government Code section 82031, an "expenditure" that compels compliance with reporting provisions of the act "means an expenditure made by any person in connection with a communication which *expressly advocates the election or defeat of a clearly identified candidate* or the qualification, passage or defeat of a clearly identified measure, *or taken as a whole*

---

[4]Government Code section 84101 reads in pertinent part: "(a) A committee that is a committee by virtue of subdivision (a) of Section 82013 shall file with the Secretary of State a statement of organization within 10 days after it has qualified as a committee." Section 84200 provides in subdivision (a): "Except as provided in paragraphs (1), (2), and (3), elected officers, candidates, and committees pursuant to subdivision (a) of Section 82013 shall file semiannual statements each year no later than July 31 for the period ending June 30, and no later than January 31 for the period ending December 31."

*and in context, unambiguously urges a particular result in an election* but which is not made to or at the behest of the affected candidate or committee." (Italics added.) An expenditure is expressly excluded from the coverage of the Act if "it is clear from the surrounding circumstances that it is not made for political purposes." (Gov. Code, § 82025.)[5]

Although the terms "expenditures" and "political purposes" are not further defined in the Political Reform Act, California Code of Regulations, title 2, section 18225, adopted by the Fair Political Practices Commission,[6] specifies that an expenditure is "any monetary or nonmonetary payment made for political purposes." (Cal. Code Regs., tit. 2, § 18225, subd. (a).) Subdivision (b) of section 18225 provides a further definition: " 'Expenditure' includes any monetary or non-monetary payment made by any person, other than those persons or organizations described in subsection (a), that is used for communications which expressly advocate the nomination, election or defeat of a clearly identified candidate or candidates, or the qualification, passage or defeat of a clearly identified ballot measure. [¶] (1) 'Clearly identified' has the following meaning: [¶] (A) A candidate is clearly identified if the communication states his name, makes unambiguous reference to his office or status as a candidate, or unambiguously describes him in any manner." According to subdivision (b)(2) of section 18225: "A communication 'expressly advocates' the nomination, election or defeat of a candidate or the qualification, passage or defeat of a measure if it contains express words of advocacy such as 'vote for,' 'elect,' 'support,' 'cast your ballot,' 'vote against,' 'defeat,' 'reject,' 'sign petitions for' or otherwise refers to a clearly identified candidate or measure so that the communication, taken as a whole, unambiguously urges a particular result in an election." (See also *Yes on Measure A v. City of Lake Forest, supra,* 60 Cal.App.4th 620, 625, fn. 4.) A payment is made for "political purposes" if it is: "For the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate or candidates, or the qualification or passage of any measure . . . ." (Cal. Code Regs., tit. 2, § 18225, subd. (a)(1).)

---

[5]"The private 'bounty hunter' provisions" of the Political Reform Act in Government Code sections 91003 and 91004 authorize private individuals to bring suit to enjoin violations or to compel compliance with the reporting or disclosure provisions, or for damages against any person who even " 'negligently violates any of the reporting requirements' " of the act. (*McCauley v. Howard Jarvis Taxpayers Assn.* (1998) 68 Cal.App.4th 1255, 1257-1258, 1260 [80 Cal.Rptr.2d 900].)

[6]The commission "is charged with '[p]rovid[ing] assistance to agencies and public officials in administering the provisions' of the act. (Gov. Code, § 83113, subd. (c).) It is authorized to adopt 'rules and regulations to carry out the purposes and provisions,' and which are 'consistent with,' the act. (Gov. Code, § 83112.)" (*Yes on Measure A v. City of Lake Forest, supra,* 60 Cal.App.4th 620, 624.) We must of course determine whether the commission's interpretation is "consistent with the guarantee of freedom of speech." (*Institute of Governmental Advocates v. Younger* (1977) 70 Cal.App.3d 878, 883 [139 Cal.Rptr. 233].)

■ Appellant argues that for First Amendment purposes "only speech that includes words that *expressly advocate the election or defeat* of a clearly identified candidate is subject to regulation" by the Political Reform Act. Appellant's position is that its advertisement "was not 'express advocacy,'" as it "contained *no* explicit words advocating the election or defeat" of a candidate, but instead was "issue oriented speech," directed at "California's energy crisis," that "*cannot* constitutionally be impinged by regulation." Respondent counters that "an ad trashing the Governor" is "express advocacy," and the threshold statutory levels of campaign expenditures by appellant were obviously reached, so a prima facie case of a violation of the Political Reform Act within the permissible parameters of the First Amendment has been established.

Our evaluation of the merits of respondent's action requires that we examine the scope and limitations of the disclosure and reporting provisions of the Political Reform act, as measured against the constitutional protections of the First Amendment. " 'To assess the constitutionality of a state election law, we first examine whether it burdens rights protected by the First and Fourteenth Amendments.' [Citation.]" (*Clark v. Burleigh* (1992) 4 Cal.4th 474, 482 [14 Cal.Rptr.2d 455, 841 P.2d 975].) The act operates "in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citation.] ■ Although First Amendment protections are not confined to 'the exposition of ideas,' [citation] 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs, . . . of course includ[ing] discussions of candidates . . . .' [Citation.] This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' [citation]. In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy*, [*supra*,] 401 U. S. 265, 272 [91 S.Ct. 621, 625], 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.' " *Buckley v. Valeo, supra*, 424 U.S. 1, 14-15 [96 S.Ct. 612, 632].)

"This does not mean that government cannot regulate at all or subject such speech to some amount of scrutiny. It does mean, however, that in this area

' "so closely touching our most precious freedoms," ' precision of regulation must be the touchstone. [Citations.]" (*Iowa Right to Life Committee, Inc. v. Williams* (8th Cir. 1999) 187 F.3d 963, 968-969.) "Courts must carefully examine governmental limitations on the right of those who wish to remain anonymous while exercising their First Amendment rights. In some circumstances, however, the government's interests in conducting fair and honest elections and in providing prospective voters with the information necessary to make an informed choice may justify a requirement that persons identify themselves when they engage in speech designed to influence the outcome of elections." (*Griset v. Fair Political Practices Com.* (1994) 8 Cal.4th 851, 859 [35 Cal.Rptr.2d 659, 884 P.2d 116].)

■ The right to free speech and association is fundamental and "being fundamental," any governmental restraint " ' "is subject to the closest scrutiny." ' " (*Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 44 [157 Cal.Rptr. 855, 599 P.2d 46]; see also *Citizens for Jobs & Energy v. Fair Political Practices Com.* (1976) 16 Cal.3d 671, 674-675 [129 Cal.Rptr. 106, 547 P.2d 1386].) "Using this test, we determine whether the restraints imposed are nonetheless justified as incidental to the promotion of a 'substantial' or 'compelling' governmental interest, unrelated to speech, and unattainable by means less intrusive upon First Amendment rights." (*Hardie v. Eu* (1976) 18 Cal.3d 371, 377 [134 Cal.Rptr. 201, 556 P.2d 301].)

■ In our examination of the coverage and validity of the Political Reform Act we must also adhere to the fundamental "rule that a statute must be interpreted in a manner, consistent with the statute's language and purpose, that eliminates doubts as to the statute's constitutionality." (*Harrott v. County of Kings* (2001) 25 Cal.4th 1138, 1151 [108 Cal.Rptr.2d 445, 25 P.3d 649].) " 'If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers.' [Citations.]" (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 548 [110 Cal.Rptr.2d 412, 28 P.3d 151].) The statute will not be invalidated if it is readily susceptible to a narrowing construction that would make it constitutional. (*Virginia v. American Booksellers Assn.* (1988) 484 U.S. 383, 397 [108 S.Ct. 636, 645, 98 L.Ed.2d 782].)

The seminal case on the issue of the implications of the First Amendment on laws regulating political expenditures is *Buckley v. Valeo, supra,* 424 U.S.

1 (*Buckley*), where the United States Supreme Court considered the validity of provisions of the Federal Election Campaign Act of 1971, as amended in 1974, which limited the amount of political contributions by individuals to $1,000 for any candidate and $25,000 total, and in one provision, title 2 of the United States Code section 434(e), required that " '[e]very person (other than a political committee or candidate) who makes contributions or expenditures' aggregating over $100 in a calendar year . . . to file a statement with the Commission."[7] (*Buckley, supra,* at pp. 74-75 [96 S.Ct. at p. 661], citing 2 U.S.C. § 434(e) (1970 supp. IV), fn. omitted.) The court acknowledged the fundamental principle "that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment," by deterring political expenditures and discourse. (*Buckley, supra,* at pp. 64, 68 [96 S.Ct. at pp. 656, 658]; see also *Griset v. Fair Political Practices Com., supra,* 8 Cal.4th 851, 861-862; *Thirteen Committee v. Weinreb, supra,* 168 Cal.App.3d 528, 534.) In evaluating the justification for the compelled disclosures, the governmental interest in providing the electorate with information to assist in the evaluation of candidates for public office and preventing corruption of the electoral process was considered "substantial." (*Buckley, supra,* at pp. 66-68 [96 S.Ct. at pp. 657-658].) The court declared that "disclosure requirements—certainly in most applications—appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." (*Id.* at p. 68 [96 S.Ct. at p. 658], fn. omitted; see also *Thirteen Committee v. Weinreb, supra,* at pp. 534-535.)

To ensure that title 2 United States Code section 434(e) was not an impermissibly broad infringement upon "those who seek to exercise protected First Amendment rights," (*Buckley, supra,* 424 U.S. 1, 77 [96 S.Ct. 612, 662]) the court limited the scope of the statute to "only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate." (*Id.* at p. 80 [96 S.Ct. at p. 664], fn. omitted.)[8] As so construed, the disclosure requirement of section 434(e) was found to withstand constitutional scrutiny by remaining "narrowly limited to those situations where the information sought has a substantial connection with the governmental

---

[7]"Contribution" and "expenditure" were defined in title 2 United States Code former section 431(e)(1) and (f)(1) as using money or other things of value "for the purpose of influencing the nomination for election, or election, of any person to Federal office."

[8]To provide examples, the court observed that its interpretation of section 434(e) properly restricted the statute's application to communications that "contain[] express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.' " (*Buckley, supra,* 424 U.S. 1, 80, fn. 108 [96 S.Ct. 612, 663], citing *id.* at p. 44, fn. 52 [96 S.Ct. at p. 651].)

interests sought to be advanced," (*Buckley, supra,* at p. 81 [96 S.Ct. at p. 664]) that is, "a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view." (*Id.* at p. 82 [96 S.Ct. at p. 664], fn. omitted.)

*Buckley* "established an important distinction between, on the one hand, issue advocacy and, on the other, express advocacy on behalf of a clearly identified candidate." (*McCauley v. Howard Jarvis Taxpayers Assn., supra,* 68 Cal.App.4th 1255, 1257, fn. 1.) *Buckley* was followed by *FEC v. Massachusetts Citizens for Life, Inc.* (1986) 479 U.S. 238, 243 [107 S.Ct. 616, 620, 93 L.Ed.2d 539] (*MCFL*), in which the court reiterated the "express advocacy" test in the case of a newsletter issued for distribution just before the 1978 primary election that encouraged readers to "Vote Pro-Life," and listed the names and photographs of "pro-life" candidates in the election. To preserve the constitutionality of an amended Federal Election Campaign Act restriction against corporate contributions or expenditures in connection with a federal election, the court interpreted the statute in a manner consistent with the standard that "an expenditure must constitute 'express advocacy' in order to" come within the coverage of the law. (*Id.* at p. 249 [107 S.Ct. at p. 623].) The "more pointed exhortations to vote for particular persons" that the " 'express advocacy' " standard is designed to encompass, were again distinguished from a "discussion of issues and candidates." (*Ibid.*) The court held that the newsletter contained "[j]ust such an exhortation" to vote for particular candidates. (*Ibid.*.) An explicit directive to vote "pro-life" read in conjunction with named "pro-life" candidates, the court reasoned, was only "marginally less direct" than a specific exhortation to vote for the named candidates. (*Ibid.*) The court appeared to marginally extend the "express advocacy" inquiry to include consideration of the logical relationship between an express term advocating election or defeat, and the names of specific candidates identified in the communication.

 The distinctions between the newsletter under consideration in *MCFL, supra,* 479 U.S. 238, and appellant's advertisement are palpable. Although it directed pointed criticism at Governor Davis, appellant's television spot did not incorporate any reference to a vote, a candidacy, an election, or any other express words of advocacy.

Respondent nevertheless relies on *Federal Election Com'n v. Furgatch* (9th Cir. 1987) 807 F.2d 857 (*Furgatch*), to argue that the publication is not beyond the reach of constitutionally permissible regulation. In *Furgatch,* the Federal Election Commission (FEC) brought an enforcement action under the Federal Election Campaign Act against the defendant for his failure to

report expenditures for political advertisements placed in The New York Times and The Boston Globe the week before the 1980 presidential election, in violation of 2 United States Code section 434(c). (*Furgatch, supra,* at p. 859.) The advertisements expressed an array of disparaging comments about President Carter,[9] which culminated with the exhortation, " 'DON'T LET HIM DO IT.' " (*Furgatch* at p. 858.) The Ninth Circuit Court of Appeals declined to "isolate each sentence" of political speech or focus exclusively on "magic words" without reference to context or external circumstances, and instead articulated a "more comprehensive approach" to the definition of " 'express advocacy' " under the Federal Election Campaign Act. (*Furgatch, supra,* at pp. 862-863.) The court concluded that "speech need not include any of the words listed in *Buckley* to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate. This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is 'express' for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed 'advocacy' if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be 'express advocacy of the election or defeat of a clearly identified candidate' when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action." (*Id.* at p. 864.) "Applying this standard to Furgatch's advertisement," the Ninth Circuit found "[r]easonable minds could not dispute" that it constituted express advocacy by urging readers "to vote against Jimmy Carter," and was therefore subject to the strictures of the Federal Election Campaign Act. (*Furgatch, supra,* at pp. 864-865.)

*Furgatch* thus expanded the definition of "express advocacy" to introduce two new components: first, a "limited reference" to the context of the communication; and second, a consideration of the reasonable interpretation of the communication.[10] (See *Chamber of Commerce of U.S. v. Moore* (5th Cir. 2002) 288 F.3d 187, 194; *Maine Right to Life Committee v. Fed. Elect.*

---

[9]The comments included: " 'The President of the United States continues degrading the electoral process and lessening the prestige of the office' "; " 'In recent weeks, Carter has tried to buy entire cities, the steel industry, the auto industry, and others with public funds' "; " 'His meanness of spirit is divisive and reckless McCarthyism at its worst' "; " 'If he succeeds the country will be burdened with four more years of incoherencies, ineptness and illusion, as he leaves a legacy of low-level campaigning'." (*Furgatch, supra,* 807 F.2d 857, 858.)

[10]Interestingly the court in *Furgatch* never mentions *MCFL, supra,* 479 U.S. 238, which was decided prior to issuance of its opinion.

*Com'n* (D. Maine 1996) 914 F.Supp. 8, 11.) Respondent maintains that this court is "bound by California law, which is based on the Ninth Circuit's ruling" in *Furgatch,* and we must follow it to similarly conclude that appellant's television advertisement, *"taken as a whole and in context,* unambiguously urged Gray Davis'[s] defeat in the gubernatorial election." Respondent submits that the ad's "attack on Governor Davis left a viewer who believed its message no other alternative than to vote against Governor Davis. It therefore constituted express advocacy and triggered [appellant's] obligation to file campaign reports."

Contrary to respondent's position we are not compelled to accept *Furgatch* as controlling authority. ▮ "[W]e are not bound by a federal circuit court opinion. [Citation.] In the absence of a controlling United States Supreme Court decision on a federal question, we are free to make an independent determination of law." (*People ex rel. Renne v. Servantes* (2001) 86 Cal.App.4th 1081, 1090 [103 Cal.Rptr.2d 870]; see also *Roskind v. Morgan Stanley Dean Witter & Co.* (2000) 80 Cal.App.4th 345, 355 [95 Cal.Rptr.2d 258].) " 'Where the federal circuits are in conflict, the decisions of the Ninth Circuit are entitled to no greater weight than those of other circuits.' [Citation.]" (*Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 783 [67 Cal.Rptr.2d 357].) We are, however, bound to accept the decisions of the United States Supreme Court. (*Irwin v. City of Hemet* (1994) 22 Cal.App.4th 507, 520, fn. 8 [27 Cal.Rptr.2d 433].)

*Furgatch* has not found approval or support in other circuits, although it was the source for a 1995 FEC regulation, 11 Code of Federal Regulations part 100.22, which revised the definition of "express advocacy."[11] To the contrary, *Furgatch* has been described as the "sole departure" from the "bright-line" test of express advocacy articulated by the United States

---

[11]Title 11 Code of Federal Regulations part 100.22 (2002) reads: *"Expressly advocating* means any communication that — (a) Uses phrases such as 'vote for the President,' 're-elect your Congressman,' 'support the Democratic nominee,' 'cast your ballot for the Republican challenger for U.S. Senate in Georgia,' 'Smith for Congress,' 'Bill McKay in '94,' 'vote Pro-Life' or 'vote Pro-Choice' accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, 'vote against Old Hickory,' 'defeat' accompanied by a picture of one or more candidate(s), 'reject the incumbent,' or communications of campaign slogan(s) or individual word(s), which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s), such as posters, bumper stickers, advertisements, etc. which say 'Nixon's the One,' 'Carter '76,' 'Reagan/Bush' or 'Mondale!'; or [¶] (b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because — [¶] (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and [¶] (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or

Supreme Court in *Buckley*. (*Chamber of Commerce of U.S. v. Moore, supra,* 288 F.3d 187, 193; see also *Faucher v. Federal Election Com'n* (1st Cir. 1991) 928 F.2d 468, 471.)

Subsection (b) of 11 Code of Federal Regulations part 100.22, which was derived directly from the language in *Furgatch*, has also been repeatedly and uniformly found violative of the First Amendment by the federal courts.[12] (*Virginia Soc. for Human Life v. FEC* (4th Cir. 2001) 263 F.3d 379, 392; *Faucher v. Federal Election Com'n, supra,* 928 F.2d 468, 471; *Virginia Society for Human Life v. Federal Elect.* (E.D.Va. 2000) 83 F.Supp.2d 668, 676-677; *Right to Life Dutchess County v. Fed. Elect. Com'n* (S.D.N.Y. 1998) 6 F.Supp.2d 248, 253-254; *Maine Right to Life Committee v. Fed. Elect. Com'n, supra,* 914 F.Supp. 8, 11-13, affd. *per curiam, Maine Right to Life v. Federal Election* (1st Cir. 1996) 98 F.3d 1.) In *Buckley* and *MCFL*, "the Supreme Court limited the FEC's regulatory authority to expenditures which, through explicit words, advocate the election or defeat of a specifically identified candidate." (*Federal Election Com'n v. Christian Action Network* (4th Cir. 1997) 110 F.3d 1049, 1062.) The constitutional flaw in subsection (b) of the FEC regulation lies in its definition of "express advocacy with reference to the reasonable listener's or reader's overall impression of the communication." (*Virginia Soc. for Human Life v. FEC, supra,* 263 F.3d 379, 392.) "The regulation thus shifts the focus of the express advocacy determination away from the words themselves to the overall impressions of the hypothetical, reasonable listener or viewer. This is precisely what *Buckley* warned against and prohibited." (*Id.* at pp. 391-392.) "[T]he Supreme Court in *Buckley* 'opted for the clear, categorical limitation, that only expenditures for communications using explicit words of candidate advocacy are prohibited, so that citizen participants in the political processes would not have their core First Amendment rights to political speech burdened by apprehensions that their advocacy of issues might later be interpreted by the government as, instead, advocacy of election result.'" (*Id.* at p. 391, citing *Federal Election Com'n v. Christian Action Network, supra,* at p. 1051.) "The regulation allows the FEC to regulate communications that do not contain express or explicit words of advocacy as required under *Buckley*, and thus not only exceeds the FEC's statutory authority under the FECA but also runs afoul of the First Amendment." (*Virginia Society for Human Life v. Federal Elect., supra,* 83 F.Supp.2d 668, 677.)

Similar Iowa statutes and a related administrative code provision, "rule 351-4.100(1)," that established reporting requirements for expenditures for

---

encourages some other kind of action." The regulation went into effect on October 5, 1995. (See final rules; announcement of effective date, 60 Fed.Reg. 52069 (Oct. 5, 1995).)

[12] In contrast, subsection (a) of 11 Code of Federal Regulations part 100.22, based upon the *Buckley* express advocacy test, has been neither challenged nor disapproved. (See *Maine Right to Life Committee v. Fed. Elect. Com'n, supra,* 914 F.Supp. 8, 11.)

"express advocacy," were also successfully challenged on First Amendment grounds in *Iowa Right to Life Committee, Inc. v. Williams, supra,* 187 F.3d 963, 969. Express advocacy was defined in subsection (a) of Iowa Administrative Code rule 351-4.100(1) in a manner "which tracks the language approved by *Buckley,*" and in subsection (b) in essentially the same language as 11 Code of Federal Regulations part 100.22(b).[13] (*Iowa Right to Life Committee, Inc. v. Williams, supra,* at p. 969.) The court concluded: "To avoid uncertainty, and therefore invalidation of a regulation of political speech, the Supreme Court in *Buckley,* established a bright-line test," with a focus "on whether the communication contains 'express' or 'explicit' words of advocacy for the election or defeat of a candidate. See *Buckley,* 424 U.S. at 43-44, 96 S.Ct. 612[, 646]. [¶] In contrast, the focus of the challenged definition is on what reasonable people or reasonable minds would understand by the communication. The definition does not require express words of advocacy." (*Ibid.*) Because "the State's definition of express advocacy creates uncertainty and potentially chills discussion of public issues," the court found the regulation violative of "core First Amendment freedoms." (*Id.* at p. 970.)

■ The definition of an "expenditure" in the Political Reform Act must be equally limited in accordance with the First Amendment mandate "that a state may regulate a political advertisement only if the advertisement advocates *in express terms* the election or defeat of a candidate." (*Chamber of Commerce of U.S. v. Moore, supra,* 288 F.3d 187, 190.) The "Ninth Circuit's approach in *Furgatch*" is inconsistent with "the bright-line rule" announced by *Buckley* and followed unvaryingly by the other federal courts. (*Id.* at p. 194.) "[T]he *Furgatch* test is too vague and reaches too broad an array of speech to be consistent with the First Amendment as interpreted in *Buckley* and *MCFL.* Instead, we iterate that the language of the communication must, by its express terms, exhort the viewer to take a specific electoral action for or against a particular candidate. [Citation.] Although application of this rule may require making straightforward connections between identified candidates and an express term advocating electoral action (as in *MCFL*), the focus must remain on the plain meaning of the words themselves." (*Id.* at pp. 194-195, fn. omitted.) Under the bright-line test of *Buckley,* "contextual factors are irrelevant to our determination whether the advertisements contain express advocacy." (*Id.* at p. 197.) While "the examples of express

---

[13]Subsection (b) of Iowa Administrative Code rule 351-4.100(1) provides that "express advocacy" means communication that: "When taken as a whole and with limited reference to external events such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) . . . because: [¶] (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and [¶] (2) Reasonable minds could not differ as to whether it encourages action to elect or defeat one or more clearly identified candidate(s) . . . or encourages some other kind of action."

advocacy listed in the *Buckley* footnote are illustrative rather than exhaustive because there are a variety of other words and phrases that convey precisely the same meaning," (*id.* at pp. 196-197), the definition of "*express* advocacy necessarily requires the use of language that explicitly and by its own terms advocates the election or defeat of a candidate. If the language of the communication contains no such call to action, the communication cannot be 'express advocacy.' " (*Id.* at p. 197.)

We must therefore read and construe the scope of the provisions that define reportable expenditures in Government Code sections 82031 and 82025, and California Code of Regulations, title 2, section 18225, narrowly in accordance with First Amendment standards to apply only to those communications that "contain express language of advocacy with an exhortation to elect or defeat a candidate." (*Iowa Right to Life Committee, Inc. v. Williams, supra,* 187 F.3d 963, 969-970.) ▉ Appellant's television spot does not contain the express or explicit words of advocacy that are subject to regulation. No campaign or election is mentioned. Nor does the advertisement overtly encourage the viewer to vote against Governor Davis. To be sure, the advertisement criticizes Governor Davis on the issue of the energy crisis, but it fails to associate the condemnation with any express endorsement of defeat of his candidacy for Governor. (Cf. *MCFL, supra,* 479 U.S. 238, 243 [107 S.Ct. 616, 620]; *Chamber of Commerce of U.S. v. Moore, supra,* 288 F.3d 187, 196.) Although the parties agree that Governor Davis was a clearly identified candidate, no election was imminent when the advertisement was presented in June of 2001, as in *MCFL* and *Furgatch.* The primary and general gubernatorial elections in 2002 were nearly eight months and 18 months away, respectively.

Nothing in the explicit language of the advertisement "*unambiguously* urged Gray Davis'[s] defeat in the gubernatorial election," as respondent claims. (Italics added.) The criticism of the Governor and his appointments to the Public Utilities Commission, along with the disparaging comment, "Gray outs from Gray Davis," may be subject to other interpretations—for instance, as a solicitation to viewers to advocate appointment of different commissioners by the Governor, or to seek change in energy policy through contact with elected officials. (See *Maine Right to Life Committee v. Fed. Elect. Com'n, supra,* 914 F.Supp. 8, 12.) Appellant's advertisement focused on the issue of the Governor's record in dealing with the energy crisis; it did not extend to express advocacy in opposition to a clearly identified candidate. Communications that discuss "the record and philosophy of specific

candidates," like the one before us, "do not constitute express advocacy under *Buckley* and *MCFL* unless they also contain words that exhort viewers to take specific electoral action for or against the candidates." (*Chamber of Commerce of U.S. v. Moore, supra,* 288 F.3d 187, 197.) We conclude based upon the advertisement at issue here that appellant cannot be compelled to comply with the disclosure and reporting obligations of the Political Reform Act.

We share the concerns expressed by respondent and the quandary discussed in many of the cases that the result reached under this bright-line approach may be counterintuitive to a sensible understanding of the message conveyed by a political advertisement. It easily permits careful selection of language to circumvent the statutory reporting requirements. However, "absent the bright-line limitation in *Buckley*, 'the distinction between issue discussion (in the context of electoral politics) and candidate advocacy would be sufficiently indistinct that the right of citizens to engage in the vigorous discussion of issues of public interest without fear of official reprisal would be intolerably chilled.' [Citation.]" (*Iowa Right to Life Committee, Inc. v. Williams, supra,* 187 F.3d 963, 970.) "[T]he result is compelled by the First Amendment, as interpreted by the Supreme Court in its effort to balance the state's interest in regulating elections with the constitutional right of free speech." (*Chamber of Commerce of U.S. v. Moore, supra,* 288 F.3d 187, 199.) *Buckley* arose from a challenge to the Federal Election Campaign Act of 1971 as amended in 1974, and we have little doubt that the recently enacted Bipartisan Campaign Reform Act of 2002 (Pub.L. No. 107-155 (Mar. 27, 2002) 116 Stat. 81) will again require our Supreme Court to revisit the relationship of the First Amendment and campaign reporting requirements. In the interim, we are required to follow *Buckley*'s bright-line test.

In view of appellant's successful First Amendment defense to the action, respondent has failed to establish a likelihood of prevailing on the merits. The section 425.16 motion to dismiss should have been granted. (*Beilenson v. Superior Court, supra,* 44 Cal.App.4th 944, 953.)

### DISPOSITION

Accordingly, the judgment is reversed, and the case is remanded to the trial court with directions to grant appellant's special motion to strike the

complaint pursuant to section 425.16. Costs on appeal are awarded to appellant.

Stein, Acting P. J., and Margulies, J., concurred.

A petition for a rehearing was denied October 22, 2002, and respondent's petition for review by the Supreme Court was denied December 11, 2002.