**CALIFORNIA PRO–LIFE COUNCIL, INC., Plaintiff–Appellant,**

v.

**Karen GETMAN, Chairman of the Fair Political Practices Commission; William Deaver, in his official capacity as member of the Fair Political Practices Commission; Carol Scott, in her official capacity as member of the Fair Political Practices Commission; Gordana Swanson, in her official capacity as member of the Fair Political Practices Commission; Jan Scully, Sacramento County District Attorney, and representative of the class of District Attorneys in the State of California; Samuel L. Jackson, Sacramento City Attorney, and representative of the class of City Attorneys in the State of California; Bill Lockyer, Attorney General; Kathleen Richer Makel; Sheridan Downey, III; Thomas S. Knox, Defendants-Appellees.**

No. 0215378.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 2003.

Filed May 8, 2003.

James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, IN, for the plaintiff-appellant.

Timothy M. Muscat, Office of the Attorney General of the State of California, Deputy Attorney General, Sacramento, California; Lawrence T. Woodlock, Fair Political Practices Commission, Sacramento, CA, for the defendants-appellees.

Christine O. Gregoire, Attorney General of the State of Washington and Shannon E. Smith, Assistant Attorney General for the State of Washington; Frankie Sue Del Papa, Attorney General for the State of Nevada; Hardy Myers, Attorney General for the State of Oregon, brief of amicus curiae in support of defendants-appellees.

Edward Lazarus, Akin, Gump, Strauss, Hauer & Feld, LLP; Nancy Northup and Deborah Goldberg, Brennan Center for Justice at NYU School of Law; Brenda Wright, National Voting Rights Institute, brief of amicus curiae in support of defendants-appellees.

Before: TROTT, RYMER, and TALLMAN, Circuit Judges.

## OPINION

TALLMAN, Circuit Judge.

In California, when a certain amount of money is spent for the purpose of defeating or passing a voter-decided proposition, state law requires the source and amount of that contribution or expenditure to be disclosed for public scrutiny. Such disclosure is needed, California argues, to fully inform the electorate and inhibit improper election practices. *See* Cal. Govt.Code § 81002(a).

California Pro–Life Council (CPLC), a non-profit corporation that frequently takes a position on California propositions relating to abortion and assisted suicide, challenges the constitutionality of California's campaign finance disclosure laws. CPLC's attack is two-fold. First, CPLC contends that California ambiguously defines which political communications are subject to regulation. According to CPLC, this vague definition violates the bright-line rule of *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), that only communications containing express words of advocacy may be subject to governmental regulation. Second, CPLC argues that California may not regulate ballot-measure advocacy. The argument goes that California may not, under any circumstance, compel disclosure of the source and amount of campaign contributions and expenditures made for the pur-

pose of defeating or passing a voter-decided proposition.

We reject CPLC's first claim and hold that California's definition of "independent expenditure" is not unconstitutionally vague. We also disagree with CPLC's second argument and hold that California may regulate express ballot-measure advocacy. However, we do not determine whether California has shown a compelling interest in informing its voters of the source and amount of funds expended on express ballot-measure advocacy, or whether its scheme is narrowly enough tailored. We leave these issues to the district court on remand.

## I

### A

Enacted by referendum in 1974, the California Political Reform Act (PRA) generally regulates "candidates" and "committees." A "committee" is defined as any individual or group who receives political contributions of more than $1,000 for any calendar year, or makes expenditures totaling more than $1,000 for any calendar year, in order to expressly advocate the passage or defeat of a ballot measure or to advocate the election or defeat of a candidate. Cal. Govt.Code §§ 82013; 82015; 82031.

Those persons or groups who qualify as "committees" are burdened by the PRA in several ways,[1] and these obligations vary depending on whether the committee is a "recipient committee" or an "independent expenditure committee." Generally speaking, both recipient committees and independent expenditure committees must comply with the PRA's detailed reporting and disclosure requirements. *See id.* § 84100 et. seq.

### B

CPLC, a non-profit corporation whose stated corporate purpose is "to promote the social welfare and the protection of all human life," seeks to engage in political advocacy without being burdened by the PRA disclosure and reporting scheme. Among its many activities, not all of which are political in nature, CPLC publishes voter guides. These guides report the positions of some federal and most statewide candidates on abortion-related topics. The guides also urge readers to vote for or against certain ballot initiatives that concern abortion or related subjects.

In September 2000, CPLC sued the Attorney General of California and members of the Fair Political Practices Commission ("Commission") (hereinafter collectively referred to as "California" or "State"). In a ten-count amended complaint, CPLC asked the district court to declare unconstitutional various provisions of the PRA. CPLC also requested that the Commission be enjoined from enforcing the alleged unconstitutional provisions.

In a memorandum and order filed October 24, 2000, the district court granted California's motion to dismiss several of CPLC's claims. The court held that: (1) CPLC does not have standing to challenge the PRA's regulation of candidate advocacy; and (2) CPLC failed to state a claim upon which relief may be granted when CPLC asserted that ballot-measure advocacy is absolutely protected speech.

Later, in September 2001, the parties stipulated to a dismissal of three counts.

Finally, in a memorandum and order filed January 22, 2002, the district court granted summary judgment in favor of California on CPLC's remaining claim. The court held that CPLC's challenge, on vagueness grounds, to the PRA's definition

1. *See generally* Chapter 4 of the PRA, § 84100 et. seq.

of "independent expenditure" was not constitutionally ripe for review.

CPLC filed the present appeal, raising three principal issues. CPLC first argues that its vagueness challenge to the PRA definition of "independent expenditure" is ripe for review. Though no enforcement proceedings have been initiated against CPLC for failure to comply with the PRA, CPLC contends that its speech has been chilled by the vague statute, thereby rendering its First Amendment challenge justiciable. Having established standing to raise its vagueness claim, CPLC next argues that the PRA definition of "independent expenditure" unconstitutionally appears to regulate protected issue advocacy. Finally, CPLC maintains that California may not regulate ballot-measure advocacy, even express ballot-measure advocacy, because such speech is absolutely protected by the First Amendment.

## II

■ We must first decide which of CPLC's claims are justiciable. Applying our decision in *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir.2000) (en banc), the district court held that CPLC could not challenge—as unconstitutionally vague—the PRA's definition of "independent expenditure" as it relates to express ballot-measure advocacy. The district court reasoned that CPLC's claim was not ripe for judicial review because California never evinced an intent to prosecute CPLC for its voter publications. We review the district court's determination of standing and ripeness de novo, *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1124 (9th Cir.1996), and hold that CPLC has suffered the constitutionally sufficient injury of self-censorship, rendering its vagueness challenge to the statute, as it relates to express ballot-measure advocacy, justiciable.

### A

■ CPLC introduced evidence before the district court that it planned to spend more than $1000 on a communication in the November 2000 general election in order to defeat California Proposition 34. The communication would not include literal, express, or explicit words of advocacy. CPLC decided against the planned expenditure because it feared that such a communication might fall within the regulatory ambit of the PRA. CPLC believed its communication would be protected issue advocacy, but it feared enforcement proceedings if it published the communication without complying with the PRA. Such a fear was reasonable, CPLC argues, because the plain language of the PRA purports to regulate those communications that, when "taken as a whole and in context, unambiguously urge[ ] a particular result in an election." Cal. Govt.Code § 82031. Thus, the statute appears to regulate even those communications that do not contain express words of advocacy. CPLC contends that it has suffered the injury of self-censorship as a result of this vague statutory language.

■ To satisfy the Article III case or controversy requirement, CPLC must establish, among other things, that it has suffered a constitutionally cognizable injury-in-fact. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (explaining that the "irreducible constitutional minimum of standing contains three elements": (1) an injury-in-fact, (2) causation, and (3) a likelihood that a favorable decision will redress plaintiff's injury). In deciding whether CPLC has suffered an injury-in-fact making this case justiciable, we need not quibble with semantics. Whether we frame our jurisdictional inquiry as one of standing or of ripeness, the analysis is the same. *See Thomas*, 220 F.3d at 1138 (not-

ing that "in many cases, ripeness coincides squarely with standing's injury in fact prong"). For simplicity, we will refer to our analysis under the "standing" rubric.[2]

■ In *Thomas* we recognized that "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Id.* at 1139. Rather, a plaintiff must face a "genuine threat of imminent prosecution." *Id.* In evaluating the genuineness of a claimed threat of prosecution, we listed three factors: (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question," (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," and (3) "the history of past prosecution or enforcement under the challenged statute." *Id.* Applying the second *Thomas* factor, the district court held that CPLC did not face a credible threat of prosecution by publishing its voter guides.[3] The district court specifically noted that California "is not investigating CPLC for any possible violations of the PRA, and has not threatened CPLC with prosecution." The district court's decision implied that absent a threat or at least a warning that California might prosecute CPLC for its publications, CPLC could not possibly have suffered an injury-in-fact sufficient to give it standing.

Though the district court's reading of *Thomas* was certainly reasonable, its interpretation of that case must be rejected. Our ruling in *Thomas* did not purport to overrule years of Ninth Circuit and Supreme Court precedent recognizing the validity of pre-enforcement challenges to statutes infringing upon constitutional rights. *Id.* at 1137 n. 1 (noting that "our decision neither shuts the door to pre-enforcement challenges to laws that allegedly infringe upon constitutional rights, nor does it establish a new approach to justiciability"). Courts have long recognized that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Ariz. Right to Life Political Action Comm. v. Bayless,* 320 F.3d 1002, 1006 (9th Cir.2003) (quoting *Reg'l Rail Reorg. Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)).

Particularly in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements. *See id.* "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Id.*

Here, CPLC feared enforcement proceedings might be initiated by the State if

---

**2.** "Sorting out where standing ends and ripeness begins is not an easy task." *Thomas,* 220 F.3d at 1138. Here, the district court—as well as the parties—framed the issue as one of ripeness.

We have noted that "the ripeness inquiry contains both a constitutional and a prudential component," *id.* (quoting *Portman v. County of Santa Clara,* 995 F.2d 898, 902 (9th Cir.1993)), and that the constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry. *See id.* Because most of the case law analyzes the constitutional component of ripeness under

the "standing" framework, we analyze justiciability in this case as a standing concern. Regardless of how we characterize our discussion, the inquiry is the same: we ask whether there exists a constitutional "case or controversy" and whether "the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Id.* at 1139 (quoting *Ry. Mail Ass'n v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945)).

**3.** The court did not specifically address CPLC's proposed communication regarding Proposition 34.

CPLC issued the Proposition 34 communication and did not comply with the PRA reporting requirements. We think CPLC's fear was reasonable. CPLC intended to issue a communication advocating the defeat of Proposition 34 without using explicit words of advocacy. The PRA appears to regulate such expenditures. The statutory definition of "independent expenditure," on its face, is not limited to including only those communications with explicit words of advocacy. We therefore hold that CPLC suffered the constitutionally recognized injury of self-censorship. *See Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (observing that self-censorship is "a harm that can be realized even without an actual prosecution").

■ We do not mean to suggest that any plaintiff may challenge the constitutionality of a statute on First Amendment grounds by nakedly asserting that his or her speech was chilled by the statute. The self-censorship door to standing does not open for every plaintiff. The potential plaintiff must have "an actual and well-founded fear that the law will be enforced against [him or her]." *Id.* In the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach. *See id.* at 392, 108 S.Ct. 636 (finding plaintiffs suffered self-censorship where the statute was "aimed directly at plaintiffs"); *Ariz. Right to Life PAC,* 320 F.3d at 1006 (noting that "it is 'sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat

that the challenged provision will be invoked against the plaintiff'") (quoting *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1154–55 (9th Cir.2000)) (internal quotation and citation omitted). As the Seventh Circuit recently observed in a context very similar to this case:

A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute. Not if it clearly fails to cover his conduct, of course. But if it arguably covers it, and so may deter constitutionally protected expression because most people are frightened of violating criminal statutes especially when the gains are slight, as they would be for people seeking only to make a political point and not themselves political operatives, there is standing.

*Majors v. Abell,* 317 F.3d 719, 721 (7th Cir.2003) (internal citations omitted). CPLC's intended communication for the November 2000 election was arguably subject to the PRA's reporting and disclosure requirements as an "independent expenditure." It follows that CPLC has standing to challenge the allegedly vague definition of "independent expenditure" as it relates to express ballot-measure advocacy.

■ Because CPLC has suffered an injury as a result of the alleged unconstitutional statute, CPLC's claim is necessarily ripe for review. *See Ariz. Right to Life PAC,* 320 F.3d at 1007 n. 6 (noting that a finding that the plaintiff has suffered a harm "dispenses with any ripeness concerns").[4]

---

4. That the 2000 election has come and gone does not moot this appeal. CPLC's injury of self-censorship is capable of repetition yet evading review. *See Porter v. Jones,* 319 F.3d 483, 490 (9th Cir.2003) (noting that "[e]lection cases often fall within [the 'capable of repetition, yet evading review'] exception [to the mootness doctrine], because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits").

## B

By the same reasoning, we hold that CPLC does not have standing to argue that the definition of "independent expenditure" is unconstitutionally vague as applied to its candidate advocacy. CPLC faces no credible threat of prosecution for its candidate advocacy because its candidate communications are purely informational. These communications list candidates and their responses to questions such as: "Do you support the legal protection of unborn children?" The Commission has held that such advocacy is not subject to PRA regulation. *See* Llewellyn Advice Letter, No. A 86-322 (March 6, 1987), available at 1987 WL 419848. CPLC therefore does not face a credible threat of prosecution for its candidate voter guides. The district court properly held that CPLC lacked standing to bring this claim.

## III

We now turn to the merits.[5] As previously noted, the PRA regulates "recipient committees" and "independent expenditure committees." Any person or group who makes an "independent expenditure" is considered an "independent expenditure committee" and must comply with the PRA's disclosure and reporting provisions. The PRA defines "independent expenditure" as

> an expenditure made by any person in connection with a communication which expressly advocates the election or defeat of a clearly identified candidate or the qualification, passage or defeat of a clearly identified measure, *or taken as a whole and in context, unambiguously urges a particular result in an election but which is not made to or at the behest of the affected candidate or committee.*

Cal. Govt.Code § 82031 (emphasis added).[6]

According to CPLC, the "taken as a whole and in context" language of the definition violates the bright-line rule set forth in *Buckley v. Valeo*, 424 U.S. 1, 43–44, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), that only those communications containing explicit *words* of advocacy may be regulated. In other words, the definition of "independent expenditure" sweeps within its regulatory grasp—or at least appears to sweep within its ambit—constitutionally protected issue advocacy.

To save the constitutionality of the statute, CPLC urges us to pull out our Article III scalpel and excise the offensive "taken as a whole and in context" language. We decline the invitation. The California courts have already performed the corrective surgery, if any was ever needed.

## A

In *Buckley*, the Supreme Court upheld the Federal Election Campaign Act's (FECA) disclosure requirements for political expenditures, but dramatically limited the scope of FECA's application. *Id.* at 76–82, 96 S.Ct. 612. The Court held that only those persons or organizations contributing or expending funds to "*expressly*

---

5. The district court, having dismissed CPLC's vagueness claims on jurisdictional grounds, did not reach this issue. We may, nonetheless, decide the matter. *See Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir.1995) (noting that issues not addressed by the district court may be entertained by the courts of appeal at their discretion). The parties have fully briefed this issue and have strenuously advocated their respective positions at oral argument. We see no reason why we should not give them a decision on the merits.

6. CPLC also objects to the language in the implementing regulation, which defines "expressly advocates" as a communication that "otherwise refers to a clearly identified candidate or measure so that the communication, *taken as a whole,* unambiguously urges a particular result in an election." Cal.Code of Reg., Title 2, § 18225(b)(2) (emphasis added).

*advocate* the election or defeat of a clearly identified candidate" could be compelled to disclose to the government their expenditures and contributions. *Id.* at 80, 96 S.Ct. 612 (emphasis added).

 Following the *Buckley* rule, we must strike down any language in the PRA purporting to regulate the discussion of issues ("issue advocacy"). Though twenty-seven years have now passed since *Buckley* was decided, debate still rages in the academic community and litigation abounds in the courts as to which political communications expressly advocate the defeat or election of a candidate [7] and therefore may be subject to regulation. *Buckley* provides some guidance. There, the Court explained that express advocacy means "explicit words of advocacy." *Id.* at 43, 96 S.Ct. 612. In a footnote, the Court further explained that express advocacy includes words "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n. 52, 96 S.Ct. 612.

Interpreting the *Buckley* definition of express advocacy as a "bright-line rule," the federal courts of appeal have generally defined express advocacy narrowly to include *only* those communications with explicit *words* of advocacy. *See, e.g., Chamber of Commerce v. Moore,* 288 F.3d 187, 193 (5th Cir.2002); *Citizens for Responsible Gov't State Political Action Comm. v. Davidson,* 236 F.3d 1174, 1187 (10th Cir. 2000); *Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963, 969 (8th Cir.1999); *FEC v. Christian Action Network, Inc.,* 110 F.3d 1049, 1051 (4th Cir.1997); *Faucher v. FEC,* 928 F.2d 468, 470–71 (1st Cir. 1991); *FEC v. Cent. Long Island Tax*

*Reform Immediately Comm.,* 616 F.2d 45, 53 (2d Cir.1980) (en banc).

Following this "magic words" approach to determining express advocacy, the Fourth Circuit recently struck down an FEC regulation defining express advocacy as "any communication that ... [w]hen *taken as a whole* ... could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s).…" *Va. Soc'y for Human Life, Inc. v. FEC,* 263 F.3d 379, 391 (4th Cir. 2001) (emphasis added). According to the Fourth Circuit, the regulation went "too far because it shift[ed] the determination of what is 'express advocacy' away from the words in and of themselves to the unpredictability of audience interpretation." *Id.* at 392 (internal quotation and citation omitted). Though acknowledging the FEC's argument that "careful diction" will allow "millions of dollars" spent to influence federal elections to escape public disclosure, the court felt constrained by *Buckley,* "which strictly limit[ed] the meaning of 'express advocacy.'" *Id.*

If *Virginia Society for Human Life,* or for that matter any of the aforementioned decisions of our sister circuits, governed us, the constitutionality of the PRA definition of "independent expenditure" would be in serious doubt. Again, the PRA definition purports to regulate those communications that, when "taken as a whole and in context, unambiguously urge[ ] a particular result in an election.…" [8] Cal. Govt. Code § 82031. By introducing context and by not tethering express advocacy to explicit words of advocacy, this part of the definition raises serious First Amendment

---

**7.** Or the defeat or passage of a ballot measure. *See infra* section IV.

**8.** The definition begins by stating that an expenditure subject to regulation is "a communication which expressly advocates the elec-

tion or defeat of a clearly identified candidate or the qualification, passage or defeat of a clearly identified measure.…" Cal. Govt. Code § 82031. Certainly there is no constitutional infirmity with this part of the definition: the language exactly tracks *Buckley.*

concerns—at least under most federal case law.

But standing apart from other circuit precedent is our decision in *FEC v. Furgatch*, 807 F.2d 857 (9th Cir.1987). *Furgatch* eschewed a "magic words" approach to determining express advocacy. "A test requiring the magic words 'elect,' 'support,' etc., or their nearly perfect synonyms for a finding of express advocacy would preserve the First Amendment right of unfettered expression only at the expense of eviscerating the Federal Election Campaign Act." *Id.* at 863. We therefore held in *Furgatch* that express advocacy may be determined by looking at the communication "as a whole" and by giving some consideration to context.[9] *Id.* at 863–64.

California and amici argue that, under *Furgatch*, we must uphold the PRA's regulation of those communications that when "taken as a whole and in context unambiguously urge[ ] a particular result in an election." Indeed, *Furgatch* instructs that the communication may be considered "as a whole" when determining express advocacy. But a close reading of *Furgatch* indicates that we presumed express advocacy must contain some explicit *words* of advocacy. *See id.* at 864 (noting that "context cannot supply a meaning that is incompatible with, or simply unrelated to, the clear import of the words"). "Context," we emphasized, "remains a consideration, but an ancillary one, peripheral to the words themselves." *Id.* at 863.

### B

 We need not decide the difficult question of whether *Furgatch* saves the California statute. In *Governor Gray Davis Committee v. American Taxpayers Alliance*, 102 Cal.App.4th 449, 125 Cal. Rptr.2d 534 (2002), the California Court of Appeal interpreted the PRA definition of "independent expenditure" narrowly "to apply only to those communications that 'contain express *language* of advocacy with an exhortation to elect or defeat a candidate.'" *Id.* at 471, 125 Cal.Rptr.2d 534 (quoting *Iowa Right to Life Comm.*, 187 F.3d at 969–70) (emphasis added). Given this narrowing construction of the statute, we cannot say the PRA's definition of "independent expenditure" overreaches.

*Governor Gray Davis* concerned a "campaign-style television ad," which criticized Governor Davis for his handling of the California energy crisis. *Id.* at 454–55, 125 Cal.Rptr.2d 534. In response to the negative advertisement, Governor Davis's re-election committee filed a complaint alleging that the advertisement's sponsor, the American Taxpayer Alliance ("Alliance"), failed to comply with the statutory reporting obligations of the PRA. *Id.* at 455, 125 Cal.Rptr.2d 534. An issue before the California Court of Appeal, then, was whether the advertisement constituted express advocacy subject to regulation under the PRA.[10]

The advertisement, airing more than one year before the November 2002 gubernato-

---

**9.** We explained that express advocacy contains three main components. First, the message of the communication must be "unmistakable and unambiguous, suggestive of only one plausible meaning." *Furgatch*, 807 F.2d at 864. Second, the speech must present "a clear plea for action." *Id.* Third, the action advocated by the communication must be clearly stated. *Id.*

**10.** The ultimate question before the court of appeal was whether the trial court erred in denying the Alliance's motion to strike the re-

election committee's complaint pursuant to California Code of Civil Procedure § 425.16. Section 425.16 is commonly referred to as the "anti-SLAPP suit statute." *See Governor Gray Davis*, 102 Cal.App.4th at 454 n. 1, 125 Cal. Rptr.2d 534. "SLAPP" stands for Strategic Lawsuit Against Public Participation. *Id.* "SLAPP litigation, generally, is litigation without merit filed to dissuade or punish the exercise of First Amendment rights of defendants." *Id.* (quoting *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 37 Cal.App.4th 855, 858, 44 Cal.Rptr.2d 46 (1995)).

rial election, accused Governor Davis of leaving California "powerless." The disparaging advertisement stopped short of expressly urging viewers to "vote against" Governor Davis in the upcoming election.[11] *See id.* at 466, 125 Cal.Rptr.2d 534 ("Although it directed pointed criticism at Governor Davis, [the Alliance's] television spot did not incorporate any reference to a vote, a candidacy, an election, or any other express words of advocacy."). Nonetheless, the re-election committee argued that "an ad trashing the Governor" must be "express advocacy." *Id.* at 463, 125 Cal. Rptr.2d 534. As support for this proposition, the committee relied on the expansive definition of express advocacy found in *Furgatch. Id.* at 466.

In holding that the advertisement was not express advocacy subject to regulation under the PRA, the California Court of Appeal first expressed its disagreement with *Furgatch.* "The *Furgatch* test is too vague and reaches too broad an array of speech to be consistent with the First Amendment as interpreted by *Buckley* and [*FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) *(MCFL)* ]." *Id.* at 470 (quoting from *Moore,* 288 F.3d at 194–95). After rejecting *Furgatch* and its consideration of context in determining express advocacy, the court went on to explain that the PRA must be construed narrowly "to apply only to those communications that 'contain ex-

press language of advocacy....'" *Id.* at 471 (quoting *Iowa Right to Life,* 187 F.3d at 969–70). Because the Alliance advertisement did not contain explicit words unambiguously urging the defeat of Governor Davis in the upcoming election, the court held that the Alliance could not "be compelled to comply with the disclosure and reporting obligations of the Political Reform Act." *Id.* at 471–72 ("Communications that discuss the record and philosophy of specific candidates, like the one before us, do not constitute express advocacy under *Buckley* and *MCFL* unless they also contain words that exhort viewers to take specific electoral action for or against the candidates.") (internal quotation marks and citation omitted).

We must defer to the California Court of Appeal's interpretation of the PRA unless there is convincing evidence that the California Supreme Court would decide the matter differently. *In re Watts,* 298 F.3d 1077, 1082 (9th Cir.2002) (explaining that this court is "bound to follow" the California Court of Appeal's interpretation of California law "absent convincing evidence that the California Supreme Court would reject the interpretation"); *see also Owen ex rel. Owen v. United States,* 713 F.2d 1461, 1464 (9th Cir.1983) (same). Nothing suggests that the California Supreme Court would construe the PRA differently. We are bound to accept the California Court of Appeal's interpretation of the PRA.[12]

---

**11.** A single voice in the advertisement stated: "He's pointing fingers and blaming others—Gray Davis says he's not responsible for California's energy problems. After all, the Public Utilities Commission blocked long-term cost-saving contracts for electricity. But who runs the PUC? The people Gray Davis appointed—Loretta Lynch and other Davis appointees who left us powerless. That's why newspapers say Davis ignored all the warning signals and turned a problem into a crisis. Gray outs from Gray Davis." *Id.* at 455 n. 2, 125 Cal.Rptr.2d 534.

**12.** At oral argument, CPLC implored us to consider another recent California Court of Appeal decision, *Schroeder v. Irvine City Council,* 97 Cal.App.4th 174, 118 Cal.Rptr.2d 330 (2002). That decision, according to CPLC, directly conflicts with *Governor Gray Davis,* making our reliance on *Governor Gray Davis* untenable. We fail to see the conflict. *Schroeder* supports, not defeats, our holding.

In *Schroeder,* a decision preceding *Governor Gray Davis,* the court of appeal recognized that "most federal courts have eschewed efforts to transform ambiguous messages into

The court of appeal's narrow construction of the PRA definition of "independent expenditure" has eliminated any concern that the definition will reach constitutionally protected speech. We accordingly hold that Cal. Govt.Code § 82031 and Cal.Code of Reg. tit. 2, § 18225 are not unconstitutionally vague.

Notwithstanding the *Governor Gray Davis* decision, CPLC argues that we cannot ignore the literal import of the statute's words, which are plainly unconstitutional. First of all, we make no judgment about the constitutionality of the statute absent the California case law's narrowing interpretation.[13] Regardless, we think the California court's interpretation of the PRA is entitled to due respect by this court. *See Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 91, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965) (deferring to the state court's interpretation of the statute to hold that the statute was constitutional, even though the statute, if literally read, would be plainly unconstitutional); *Majors*, 317 F.3d at 724 (noting that "literal interpretations are often rejected to save a statute from being held unconstitutional" and that "[a] state court is bound to have a better idea of the elasticity of the state's statutes than a federal court would have"); *see also Reg. Rail Reorg. Act Cases*, 419 U.S. at 134, 95 S.Ct. 335 (providing that statutes should be construed to comport with the Constitution).

## IV

 We next turn to CPLC's more general challenge to the PRA's regulation of ballot-measure advocacy. According to CPLC, voter-decided propositions concern *issues*, not candidates. Thus, ballot-measure advocacy *is* constitutionally protected issue advocacy and may not be burdened by disclosure and reporting.[14]

Whether a state may regulate speech advocating the defeat or passage of a ballot measure is an issue of first impression in the federal courts of appeal.[15] The district court dismissed CPLC's challenge for

---

express advocacy based on external contextual factors and instead have adhered to a bright-line test requiring express words of advocacy." *Id.* at 188, 118 Cal.Rptr.2d 330 (internal citation omitted). This majority approach, noted the court, differed somewhat from the rule of *Furgatch*. *Id.*

The court ultimately held that under *either* the majority rule or *Furgatch*, the communication at issue did not contain express advocacy. *Id.* at 189, 118 Cal.Rptr.2d 330. Thus, the court did not expressly adopt *Furgatch* as the law in California. Though *Schroeder* did not expressly disavow the *Furgatch* rule either (as *Governor Gray Davis* subsequently did), it certainly limited the reach of the *Furgatch* decision. "[E]ven if *Furgatch* retains vitality," the *Schroeder* court opined, the appellant "overstates the extent to which it permits reference to external context." *Id.* at 188, 118 Cal.Rptr.2d 330. "*Furgatch's* focus was on the *communication itself*, not external factors. . . ." *Id.* (emphasis added).

By tethering express advocacy to the actual words communicated—and not external factors—the *Schroeder* decision reinforces and certainly does not diminish the narrow construction given to the PRA definition of "independent expenditure" in *Governor Gray Davis*.

**13.** Under *Furgatch*, the statute may well pass constitutional muster.

**14.** California did not challenge CPLC's standing to raise this claim, and the district court acknowledged that CPLC had standing. We likewise agree that the claim is justiciable. CPLC has expressly advocated for the defeat or passage of ballot measures in the past, and it intends to continue such advocacy in the future. *See supra* Section II.A.

**15.** At least two district courts have held that state regulation of ballot-measure advocacy is not per se unconstitutional. *See Richey v. Tyson*, 120 F.Supp.2d 1298, 1310 (S.D.Ala. 2000) (explaining that express ballot-measure advocacy is " 'express advocacy' that is subject to constitutionally permissible restriction"); *Volle v. Webster*, 69 F.Supp.2d 171, 173–74 (D.Maine 1999) (holding that "although there are First Amendment restrictions on what a state can do, a public filing requirement in an issue—only election is not wholly prohibited").

failure to state a claim. In rejecting CPLC's argument that the state does not have an interest in informing the electorate of the source of funding for ballot-measure initiatives, the district court held that California's interest in providing the electorate with information concerning the source of funds expended to defeat or pass ballot-measure initiatives is substantial. But the district court never decided if California's interest is compelling in relation to the infringement of core First Amendment speech, or if California's regulatory scheme is closely tailored to advance California's substantial disclosure interest.

■ We review de novo the district court's dismissal for failure to state a claim, *Zimmerman v. City of Oakland,* 255 F.3d 734, 737 (9th Cir.2001), and affirm the district court's conclusion that "express ballot-measure advocacy is not immune from regulation." But although the First Amendment tolerates some regulation of express ballot-measure advocacy, it does not necessarily follow that the PRA regulations are constitutional. For California to regulate individuals or organizations like CPLC who engage in activities other than political advocacy, California must have a compelling interest, and the regulations imposed must be narrowly tailored to advance the relevant interest. On remand, the district court should determine whether California's informational interest is sufficiently compelling to justify its regulation of groups like CPLC and, if so, whether the PRA regulations are closely tailored to advance this interest.

## A

■ The PRA compels those who qualify as political "committees" to submit detailed reports to the State. *See generally* Cal. Govt.Code § 84200 et seq. In these reports, committees must disclose for public scrutiny the source and amount of political expenditures and contributions. *See generally* Cal. Govt.Code § 84211. This compelled disclosure—which applies to both express candidate and ballot-measure advocacy—unquestionably infringes upon the exercise of First Amendment rights. *See Buckley,* 424 U.S. at 68, 96 S.Ct. 612. Because it burdens core political speech, the PRA's disclosure regime "must be justified by a compelling state interest." *MCFL,* 479 U.S. at 256, 107 S.Ct. 616.[16]

**16.** We recognize that the Supreme Court has been less than clear as to the proper level of judicial scrutiny we must apply in deciding the constitutionality of disclosure regulations such as those in the PRA. The *Buckley* Court claimed to apply "exacting scrutiny" in analyzing the FECA disclosure and reporting requirements, 424 U.S. at 64, 96 S.Ct. 612, but then noted that its review was whether a " 'substantial relation' existed between the governmental interest and the information required to be disclosed." *Id.* In *C & C Plywood,* a case filed two years after *Buckley,* we observed that disclosure regulations for express ballot-measure advocacy may be enacted "without a showing of a compelling state interest." *C & C Plywood Corp. v. Hanson,* 583 F.2d 421, 425 (9th Cir.1978). We obviously assumed there that strict judicial review of disclosure statutes was inappropriate.

Notwithstanding *Buckley* and *C & C Plywood,* we subject California's disclosure requirements to strict scrutiny. In doing so, we follow the Court's post-*Buckley* decision of *MCFL,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539. There the Court subjected disclosure and reporting provisions of FECA to strict scrutiny because those provisions applied to "organizations whose major purpose is not campaign advocacy, but who occasionally make independent expenditures on behalf of candidates." 479 U.S. at 252–53, 107 S.Ct. 616. The Court recognized that reporting and disclosure requirements are more burdensome for multi-purpose organizations (such as CPLC) than for political action committees whose sole purpose is political advocacy. *See id.* at 255–56, 107 S.Ct. 616. Given that the *MCFL* Court considered FECA's disclosure requirements to be a severe burden on political speech for multi-purpose organizations, we must analyze the California statute under strict scrutiny. Post-*Buckley,* the Court has repeatedly held that any regulation

1

■ We first address CPLC's argument that all ballot-measure advocacy is pure issue advocacy beyond the purview of any state regulation. We think Supreme Court precedent on this point is clear: express ballot-measure advocacy is not constitutionally sacrosanct speech. There is no per se constitutional prohibition on its regulation.

The Court has repeatedly acknowledged the constitutionality of state laws requiring the disclosure of funds spent to pass or defeat ballot measures. For example, in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Court declared unconstitutional a Massachusetts law prohibiting corporations from making contributions or expenditures to influence the outcome of state referenda. In striking down the law, the Court did not hold that ballot-measure advocacy was "issue advocacy" entitled to absolute protection under the First Amendment. Rather, the Court found that the extreme burden on corporate speech—in this case an outright ban—was not justified by a compelling state interest. 435 U.S. at 795, 98 S.Ct. 1407. Though "corporate advertising may influence the out-come of the vote," the Court reasoned, "the fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Id.* at 790, 98 S.Ct. 1407. The Court noted that suppression was unnecessary because voters could evaluate the corporate speakers themselves—in part through disclosure laws. *Id.* at 791–92, 98 S.Ct. 1407 ("[Voters] may consider, in making their judgment, the source and credibility of the advocate."). The *Bellotti* Court spe-

cifically recognized the importance of disclosure in the ballot-measure context by noting "the prophylactic effect of requiring that the source of communication be disclosed." *Id.* at 792 n. 32.

Again in *Citizens Against Rent Contol v. City of Berkeley,* 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), the Court observed that regulations compelling the disclosure of expenditures and contributions in the ballot-initiative context passed constitutional muster. In that case, the Court struck down an ordinance placing a $250 limitation on contributions to committees formed to support or defeat ballot measures. Though *Buckley* had upheld contribution limitations for *candidates* for federal office, the Court explained that "*Buckley* does not support limitations on contributions to committees formed to favor or oppose *ballot measures.*" *Id.* at 297, 102 S.Ct. 434. The Court noted that "[t]he risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Id.* at 298, 102 S.Ct. 434 (quoting *Bellotti,* 435 U.S. at 790, 98 S.Ct. 1407).

Significantly, the Court rejected the City of Berkeley's argument that the ordinance was "necessary as a prophylactic measure to make known the identity of supporters and opponents of ballot measures." *Id.* "Here," the Court explained, "there is no risk that the Berkeley voters will be in doubt as to the identity of those whose money supports or opposes a given ballot measure *since contributors must make their identities known* under [a different section] of the ordinance, which requires publication of lists of contributors in advance of the voting." *Id.* (emphasis add-

severely burdening political speech must be narrowly tailored to advance a compelling state interest. *See Austin v. Mich. Chamber of Comm.,* 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990); *see also Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182,

192 n. 12, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); *Ariz. Right to Life PAC,* 320 F.3d at 1007–1010.

ed). "The integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed; if it is thought wise, *legislation can outlaw anonymous contributions.*" *Id.* at 299–300, 102 S.Ct. 434 (emphasis added).

Recently, in *Buckley v. American Constitutional Law Foundation,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (*Buckley II* ), the Court invalidated several Colorado regulations concerning the state's petition process but upheld the regulation requiring "sponsors of ballot initiatives to disclose who pays petition circulators, and how much." 525 U.S. at 205, 119 S.Ct. 636. The Court approvingly observed that this requirement informed voters of "the source and amount of money spent by proponents to get a measure on the ballot." *Id.* at 203, 119 S.Ct. 636. Then, in *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton,* 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002), the Court held that an ordinance requiring all door-to-door canvassers to register with the Village violated the First Amendment. 536 U.S. at 164, 122 S.Ct. 2080. But the Court explicitly recognized that reporting requirements were appropriate in limited circumstances. Disclosure "may well be justified in some situations—for example, by the special

state interest in protecting the integrity of a ballot-initiative process...." *Id.* at 167, 122 S.Ct. 2080.[17]

Contrary to CPLC's assertion, *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), does not suggest that ballot-measure advocacy is absolutely protected speech.[18] *McIntyre* concerned an Ohio statute prohibiting the distribution of anonymous campaign literature. 514 U.S. at 336, 115 S.Ct. 1511. In violation of the statute, McIntyre distributed leaflets expressly advocating the defeat of a proposed school tax levy and was fined by the state. *Id.* at 337–38, 115 S.Ct. 1511.

After emphasizing the history and importance of anonymous speech, *id.* at 341–43, 115 S.Ct. 1511, the Court applied strict scrutiny to strike down the disclosure regulation. *Id.* at 347, 115 S.Ct. 1511. In so doing, the Court dismissed Ohio's argument that the statute was justified because of Ohio's compelling interest in informing the electorate. *Id.* at 348, 115 S.Ct. 1511. "[I]n the case of a handbill written by a private citizen who is not known to the recipient, the name and address of the author add little, if anything, to the reader's ability to evaluate the document's message." *Id.* at 348–49, 115 S.Ct. 1511.[19]

17. Our Ninth Circuit precedent also has recognized the constitutionality of required disclosure for political expenditures and contributions made in the ballot-measure context. *See C & C Plywood Corp.,* 583 F.2d at 425 (noting that "regulations to insure disclosure of the source of payments or contributions may be enacted" for ballot issues).

18. CPLC also argues that *Buckley* prohibits regulation of express ballot-measure advocacy. *Buckley* held that express advocacy includes "expenditures for communications that in express terms advocate the election or defeat of a clearly identified *candidate.*" 424 U.S. at 80, 96 S.Ct. 612 (emphasis added).

But we do not read *Buckley* to mean that only candidate-related political speech may be regulated. *Buckley* addressed the constitutionality of the FECA, a statute regulating federal elections. Since there are no federal initiatives or referenda, the *Buckley* Court never considered the constitutionality of regulating ballot-measure advocacy.

19. In a footnote, the Court expanded on this notion: "Of course, the identity of the source is helpful in evaluating ideas. But the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Id.* at 349 n. 11, 115 S.Ct. 1511 (citation and internal quotation marks omitted).

Like the Court in *McIntyre,* CPLC asks us to disregard California's informational interest in disclosure and hold that ballot-measure advocacy is absolutely protected speech.[20] We think *McIntyre* is distinguishable from the case at bar, as the *McIntyre* Court itself observed. There the Court drew a distinction between prohibiting the distribution of anonymous literature and the mandatory disclosure of campaign-related *expenditures and contributions.* *Id.* at 353–55, 115 S.Ct. 1511 (distinguishing *Buckley*). Though contributing and expending money is a form of speech, the Court explained that this type of speech is less worthy of protection than McIntyre's "personally crafted" leaflet:

A written election-related document—particularly a leaflet—is often a personally crafted statement of a political viewpoint. Mrs. McIntyre's handbills surely fit that description. As such, identification of the author against her will is particularly intrusive; it reveals unmistakably the content of her thoughts on a controversial issue. Disclosure of an expenditure and its use, without more, reveals far less information. It may be information that a person prefers to keep secret, and undoubtedly it often gives away something about the spender's political views. Nonetheless, even though money may "talk," its speech is less specific, less personal, and less provocative than a handbill—and as a result, when money supports an unpopular

viewpoint it is less likely to precipitate retaliation.

*Id.* at 355, 115 S.Ct. 1511.

Given the Supreme Court's repeated pronouncements, we think there can be no doubt that states may regulate express ballot-measure advocacy through disclosure laws. Such speech is political in nature, and "[t]he principles enunciated in *Buckley* extend equally to issue-based elections . . . ." *Id.* at 347, 115 S.Ct. 1511.

2

Having disposed of CPLC's argument that ballot-measure advocacy is absolutely protected speech, we are left with the issue of whether California has a compelling interest in requiring CPLC to report its express ballot-measure advocacy contributions and expenditures and whether such regulations are narrowly tailored.[21] We leave these issues to the district court to decide in the first instance, which may well require development of the record beyond the pleadings. *Montana Chamber of Commerce v. Argenbright,* 226 F.3d 1049 (9th Cir.2000).

B

CPLC argues that our remand is inappropriate because California does not—as a matter of law—have any interest in regulating express ballot-measure advocacy that could be compelling. We disagree. The relevant interest is informational, and

**20.** Cutting against CPLC's argument is the fact that the Court did not hold that McIntyre's speech was constitutionally sacrosanct; rather, the Court applied strict scrutiny to strike down the statute. We, too, subject the PRA's disclosure requirements to strict scrutiny. In that regard, our analysis is entirely consistent with *McIntyre.*

**21.** If the district court determines on remand that California has a sufficiently compelling interest that would justify its disclosure laws

for express ballot-measure advocacy, the court must then decide if the means chosen by California to effectuate this interest are narrowly drawn. In *MCFL,* the Supreme Court recognized that disclosure laws may not impose overly burdensome administrative costs and organizational requirements for groups such as CPLC "whose major purpose is not campaign advocacy, but who occasionally make independent expenditures." *See MCFL,* 479 U.S. at 251–65, 107 S.Ct. 616.

the district court could conclude on remand that this interest is sufficiently compelling to survive strict judicial scrutiny.

Every other year, California voters decide the fate of complex policy proposals of supreme public significance. In the past ten years alone, California voters have passed propositions increasing the sentences for "third strike" criminal offenders, rendering illegal aliens ineligible for public services, banning affirmative action, mandating that public education be conducted in English, and imposing contribution limits for political campaigns.

California's high stakes form of direct democracy is not cheap. Interest groups pour millions of dollars into campaigns to pass or defeat ballot measures. Nearly $200 million was spent to influence voter decisions on the 12 propositions on the 1998 ballot. Of that total, $92 million was spent on one gaming initiative.[22] The total amount spent by proponents and opponents of ballot measures has even outpaced spending by California's legislative candidates.

All this money produces a cacophony of political communications through which California voters must pick out meaningful and accurate messages. Given the complexity of the issues and the unwillingness of much of the electorate to independently study the propriety of individual ballot measures, we think being able to evaluate

who is doing the talking is of great importance.

The Supreme Court has recognized as much. In *Buckley,* the Court noted that disclosure advances the substantial government interest of providing

> the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and facilitate predictions of future performance in office.

424 U.S. at 66–67, 96 S.Ct. 612 (internal citation omitted).[23]

Though the *Buckley* Court discussed the value of disclosure for candidate elections, the same considerations apply just as forcefully, if not more so, for voter-decided ballot measures. "Even more than candidate elections, initiative campaigns have become a money game, where average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their

---

**22.** California Indian tribes spent more than $66 million to win the right to place casinos on their reservations; rival Nevada interests spent close to $26 million to protect their gaming monopoly.

**23.** In *Buckley,* the Court explained that compelled disclosure of political contributions and expenditures serves three main interests: (1) informing the electorate about the sources and uses of funds expended, (2) deterring corruption and the appearance of corruption, and (3) gathering data to detect violations. *Buckley,* 424 U.S. at 66–68, 96 S.Ct. 612. Only the informational interest applies in the

ballot-measure context, however. "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *Bellotti,* 435 U.S. at 789–90, 98 S.Ct. 1407; *see also Buckley II,* 525 U.S. at 203, 119 S.Ct. 636 (noting that "ballot initiatives do not involve the risk of 'quid pro quo' corruption present when money is paid to, or for, candidates"). The interest in collecting data to detect violations also does not apply, since there is no cap on ballot-measure contributions or expenditures in California.

self-interest." David S. Broder, *Democracy Derailed: Initiative Campaigns and the Power of Money* at 18 (2000). Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown. At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation.[24]

Voters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation. We think Californians, as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much. *See United States v. Harriss*, 347 U.S. 612, 625, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

In *Harriss*, the Supreme Court upheld the Lobbying Act, which required lobbyists to disclose to Congress any contributions they had received and any expenditures they had made "for the purpose of influencing the passage or defeat of any legislation by Congress." 347 U.S. at 614, 74 S.Ct. 808. In articulating the governmental interest for this restriction on speech, the Court wrote:

Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.

Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose. *Id.* at 625, 74 S.Ct. 808.

If our Congress "cannot be expected to explore the myriad pressures to which they are regularly subjected," then certainly neither can the general public. People have jobs, families, and other distractions. While we would hope that California voters will independently consider the policy ramifications of their vote, and not render a decision based upon a thirty-second sound bite they hear the day before the election, we are not that idealistic nor that naive. By requiring disclosure of the source and amount of funds spent for express ballot-measure advocacy, California—at a minimum—provides its voters with a useful shorthand for evaluating the speaker behind the sound bite.[25]

24. Disclosure also prevents the wolf from masquerading in sheep's clothing. Proposition 199, which was on the March 1996 Primary Election ballot, provides such an example. That initiative was entitled the "Mobile Home Fairness and Rental Assistance Act," but the proposed law was hardly the result of a grassroots effort by mobile home park residents wanting "fairness" or "rental assistance." Two mobile home park *owners* principally backed the measure. After the real interests behind the measure were exposed, various newspaper editorials decried the initiative's "subtly misleading name" and explained that the initiative's real purpose was to eliminate local rent control for mobile home parks. The measure was soundly defeated, though proponents outspent opponents $3.2 million to $884,000.

25. California introduced evidence before the district court demonstrating that voters will cast their vote based upon the identity of

We therefore hold that California is not prevented as a matter of law from arguing that it has a sufficiently compelling informational interest in requiring those who expressly advocate the defeat or passage of a ballot measure to disclose their expenditures and contributions. Whether a more fully developed factual record could in fact establish this compelling interest, and by what constitutional means this interest may be advanced, we leave to the capable district judge.

## V

We summarize our holdings as follows:

CPLC's claim that the PRA definition of "independent expenditure" is unconstitutionally vague was properly before the district court. CPLC was not obliged to await enforcement proceedings in order to challenge the statute; self-censorship is a constitutionally sufficient injury to render CPLC's claim justiciable.

After the California Court of Appeal's decision in *Governor Gray Davis,* we cannot say the definition of "independent expenditure" overreaches to include constitutionally protected issue advocacy.

Express ballot-measure advocacy is not constitutionally sacrosanct speech. California may regulate it, provided that California has a constitutionally sufficient interest in doing so. California may well have a compelling interest in informing its voters of the source and amount of funds expended on express ballot-measure advocacy. Even if compelling, California's informational interest in required disclosure is not without limitation: unnecessary administrative and organizational requirements will not pass constitutional muster. The district court shall determine on remand whether California in fact has a compelling informational interest justifying its disclosure laws. If so, the court must then determine whether the means chosen by California comport with the First Amendment.

**AFFIRMED** in part; **REVERSED** in part; and **REMANDED** for further proceedings. Each party shall bear its own costs on appeal.

those supporting or opposing a ballot measure. For example, after a sample of California voters was informed that more than 60% of the funds used to place Proposition 226 on the 1998 ballot came from out-of-state interests, support for the ballot measure waned significantly. (In this pre-election focus group, voters were asked to "vote" on Proposition 226 after reading the ballot title and a summary of the measure. Then voters were informed about the out-of-state interests backing the initiative and asked to revote. The number of "undecided" votes diminished and many previous supporters of the proposition now voted against the measure. The total "swing" in votes equaled 15 to 20 percentage points.)

In a survey of 600 California voters who participated in the November 2000 election, 71% of those polled stated that it is important to know the source and amount of contributions made to campaign for and against ballot measures. Interestingly, only 57% of those polled indicated that endorsements by interest groups and politicians were important.