[No. B176846. Second Dist., Div. Four. Dec. 20, 2005.]

WADE MAJOR, Plaintiff and Respondent, v.
OZZIE SILNA, Defendant and Appellant.

## COUNSEL

Weissmann, Wolff, Bergman, Coleman, Grodin & Evall, Michael Bergman, Abraham M. Rudy and Anjani Mandavia for Defendant and Appellant.

Richards, Watson & Gershon, Steven R. Orr and Ginetta L. Giovinco for Plaintiff and Respondent.

## OPINION

**CURRY, J.**—After respondent Wade Major voluntarily dismissed his action for injunctive relief against appellant Ozzie Silna, the trial court denied Silna's request for attorney fees under Code of Civil Procedure section 425.16[1]—the law curtailing the filing of strategic lawsuits against public participation, often called the "anti-SLAPP law." We reverse and remand for a determination of the award.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute the following facts: The City of Malibu has enacted its own campaign finance law, codified in chapter 2.20 of the Malibu Municipal Code (MMC), that regulates campaign contributions and other campaign activities. Pertinent here is section 2.20.030(B)(1) of the MMC, which provides: "No person shall make to any candidate for city council . . . a contribution or contributions that would cause the total amount contributed by such person to the candidate . . . to exceed one hundred dollars ($100.00) for each single election for member of the city council."

The MMC defines "contribution" as including "[a]n expenditure made at the behest of a candidate . . . unless full and adequate consideration is received for making the expenditure," (MMC, § 2.20.020(C)(1)) but exempts "any independent expenditure as defined in the Political Reform Act of 1974" (MMC, § 2.20.020(C)(2); see Gov. Code, § 81000 et seq.; PRA). Under the

---

[1] All statutory citations are to this code unless otherwise indicated.

PRA, an independent expenditure is "made by any person in connection with a communication which expressly advocates the election or defeat of a clearly identified candidate . . . but which is not made to or at the behest of the affected candidate . . . ." (Gov. Code, § 82031.) The phrase "made at the behest of," as used in the PRA, is defined by regulation to mean "made under the control or at the direction of, in cooperation, consultation, coordination, or concert with, at the request or suggestion of, or with the express, prior consent of." (Cal. Code Regs., tit. 2, § 18225.7, subd. (a).)

Section 2.20.070(A) of the MMC provides that violations of Malibu's campaign finance law may be punished as misdemeanors. In addition, section 2.20.070(B) authorizes certain actions for injunctive relief.

In connection with an election on April 13, 2004, Silna mailed a letter to a number of Malibu residents supporting Jay Leibig, Walt Keller, and William Winokur, who were candidates for seats on the Malibu City Council.[2] On March 10, 2004, Major filed a complaint for injunctive relief, alleging that (1) Silna's mailing exceeded $100.00 in value and was made at the behest of these candidates, in violation of the MMC, and (2) Silna planned to engage in further violations of the MMC, namely, pay for political advertisements in a local newspaper.

Shortly thereafter, Major applied for a temporary restraining order. In support of his application, he submitted declarations indicating that Winokur had identified Silna as a member of his campaign team, Silna had appeared at candidate information meetings on Winokur's behalf, and the cost of Silna's mailing exceeded $100.00. He also submitted evidence that Xandra Kayden, who had been retained by the City of Malibu to oversee the election, had opined in a report that Silna's expenditures were made at the behest of the candidates in question.

In opposition, Silna contended that Major lacked standing to seek injunctive relief under the MMC. In addition, he submitted declarations from

---

[2] Silna's letter states in pertinent part: "Dear Neighbors: [¶] I would like to enlist your support for the following three candidates that are running for City Council in the election that will take place on April 13, 2004. They are Jay Liebig, Walt Keller, & William Winokur. [¶] I believe these candidates deserve your support because they can help us end the program of personal attacks, constant fighting, and the lack of results we have seen from our current City Council. These three candidates all opposed the Malibu Bay Company Development Measure (MEASURE M), which was soundly defeated, and for which the City Council incumbents actively campaigned. [¶] Here are some things you can do to help elect the 'Good Guys.' [¶] 1. Volunteer to invite friends and neighbors to a coffee at your home, where they can meet the candidates, and get the answers to important questions. [¶] 2. Make a contribution to the candidates ($100 limit per contributor per candidate) to help them get their message out. [¶] Campaign contributions checks can be made out as follows: . . . [¶] We need to get Malibu Back on the Right Track. It is Time for a Change!" (Italics omitted.)

Winokur, Leibig, and himself denying that he was on a campaign team and that he had acted at any candidate's request in sending out his mailing. Silna also raised evidentiary objections to Major's showing.

At the hearing of the application for a temporary restraining order on March 16, 2004, the trial court sustained many of Silna's objections, but declined to decide whether Major had standing to seek injunctive relief under the MMC. It denied the application, reasoning that Major had failed to establish a probability of prevailing on the merits, the balance of equities favored Silna, and Major's showing was insufficient to justify a prior restraint on Silna's rights of free expression.

On March 22, 2004, Silna filed a motion under the anti-SLAPP law to strike Major's complaint. Major dismissed his action against Silna on March 24, 2004.

On April 8, 2004, Silna requested an award of attorney fees under the anti-SLAPP law. Following a hearing, the trial court denied this request on June 10, 2004, reasoning that Major's action fell within an exception to anti-SLAPP law in section 425.17, subdivision (b). This appeal followed.

## DISCUSSION

Silna contends that the trial court erred in denying his request for attorney fees under the anti-SLAPP law. We agree.

### A. *Governing Law*

■ Under section 425.16, "[w]hen a lawsuit arises out of the exercise of free speech or petition, a defendant may move to strike the complaint. [Citations.] The complaint is subject to dismissal unless the plaintiff establishes 'a probability that [he or she] will prevail on the claim.' [Citations.]" (*Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 949 [52 Cal.Rptr.2d 357], quoting § 425.16, subd. (b).)

In enacting section 425.16, the Legislature declared there to be a "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech . . . ." (§ 425.16, subd. (a).) The anti-SLAPP law encompasses actions arising from "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) Because "[t]he right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech[,]" the anti-SLAPP law has been applied to actions arising from political literature discussing the

qualifications of candidates during elections. (*Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548 [46 Cal.Rptr.2d 880] [citing cases].)

■ Resolution of an anti-SLAPP motion "requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) We review the trial court's determinations on these matters de novo. (*Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456 [125 Cal.Rptr.2d 534].)

■ Parties that prevail on their anti-SLAPP motions are entitled to an award of attorney fees and costs. (§ 425.16, subd. (c).) Generally, when the plaintiff in an action dismisses the action after an anti-SLAPP motion is filed, the trial court is obliged to adjudicate the motion and make an award of fees and costs if the defendant prevails on the motion. (*Liu v. Moore* (1999) 69 Cal.App.4th 745, 751 [81 Cal.Rptr.2d 807].)

Here, the trial court did not address the merits of Silna's pending motion, reasoning that Major's action fell *outside* the anti-SLAPP law pursuant to section 425.17. "The Legislature enacted section 425.17, effective January 1, 2004, to address a 'disturbing abuse' in litigants' use of the anti-SLAPP statute. (§ 425.17, subd. (a).)" (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 112 [15 Cal.Rptr.3d 215].)

■ To address these abuses, section 425.17 excludes certain types of claims that would otherwise have fallen under the scope of the anti-SLAPP law. (*Mann v. Quality Old Time Service, Inc., supra*, 120 Cal.App.4th at p. 112.) Subdivisions (b) and (c) of section 425.17, respectively, carve out exceptions to the anti-SLAPP law for (1) actions taken in the public interest and (2) actions against persons engaged in commercial speech. However, subdivision (d) of section 425.17 imposes limitations on the scope of these exceptions.

Pertinent here are subdivisions (b) and (d)(2) of section 426.17. Subdivision (b) provides that section 425.16 does not apply to an action "brought solely in the public interest or on behalf of the general public," provided that the following conditions are met: "(1) The plaintiff does not seek any relief greater than or different from the relief sought for the general public or a class of which the plaintiff is a member. A claim for attorney's fees, costs, or penalties does not constitute greater or different relief for purposes of this

subdivision. [¶] (2) The action, if successful, would enforce an important right affecting the public interest, and would confer a significant benefit, whether pecuniary or nonpecuniary, on the general public or a large class of persons. [¶] (3) Private enforcement is necessary and places a disproportionate financial burden on the plaintiff in relation to the plaintiff's stake in the matter."

However, subdivision (d)(2) of section 425.17 provides that this "public interest" exception to the anti-SLAPP law does *not* apply to "[a]ny action against any person or entity based upon the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work, including, but not limited to, a motion picture or television program, or an article published in a newspaper or magazine of general circulation."[3]

Here, the trial court determined that Major's action fell within the "public interest" exception. It reasoned that the action satisfied the first two conditions for the exception because it conferred no special benefit on Major, and it concerned the important public interest in fair and open campaign financing. Furthermore, it found that Major's action was "necessary" under the third condition, pointing to a declaration from the Malibu City Attorney, who stated that her office would not have been able to act on a complaint from Major prior to the election.

### B. *Subdivision (d)(2), Section 425.17*

The first issue before us is whether the trial court erred in concluding that the "public interest" exception in section 425.17 bars application of the anti-SLAPP law to Major's action. Silna contends that Major's action falls within the qualification to this exception in subdivision (d)(2) of section

---

[3] Subdivision (d) of section 425.17 provides in full that the exceptions to the anti-SLAPP law in subdivisions (b) and (c) do not apply to actions against the following parties: "(1) Any person enumerated in subdivision (b) of Section 2 of Article I of the California Constitution or Section 1070 of the Evidence Code, or any person engaged in the dissemination of ideas or expression in any book or academic journal, while engaged in the gathering, receiving, or processing of information for communication to the public. [¶] (2) Any action against any person or entity based upon the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work, including, but not limited to, a motion picture or television program, or an article published in a newspaper or magazine of general circulation. [¶] (3) Any nonprofit organization that receives more than 50 percent of its annual revenues from federal, state, or local government grants, awards, programs, or reimbursements for services rendered."

425.17 (subdivision (d)(2)). For the reasons that we explain *post*, we agree with this contention.[4]

In *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050, 1067–1068 [28 Cal.Rptr.3d 933], we concluded that subdivision (d)(2) encompassed an action against a radio broadcasting corporation and its employees based on allegations that the plaintiff had been improperly excluded from participating in a call-in talk show. However, no court has squarely addressed whether it applies to actions against individuals engaged in the distribution of political literature during an election campaign.[5]

■ The issue presented is therefore one of first impression, and poses a question of law, namely, the proper interpretation of a statute. (*R & P Capital Resources, Inc. v. California State Lottery* (1995) 31 Cal.App.4th 1033, 1036 [37 Cal.Rptr.2d 436].) "Our primary task in construing a statute is to determine the Legislature's intent. [Citation.] Where possible, 'we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law. . . .' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 [3 Cal.Rptr.3d 636, 74 P.3d 737], quoting *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632 [59

---

[4] Major argues that Silna has waived this contention because he did not present it to the trial court. However, we may consider the contention because—as we elaborate in the text—it can be resolved as "a pure question of the application of law to undisputed facts." (*Yeap v. Leake* (1997) 60 Cal.App.4th 591, 599, fn. 6 [70 Cal.Rptr.2d 680]; see *Palmer v. Shawback* (1993) 17 Cal.App.4th 296, 299–301 [21 Cal.Rptr.2d 575] [denial of fee award is reversed on the basis of a purely legal theory presented for the first time on appeal].)

[5] The parties have directed our attention to *Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1375 [34 Cal.Rptr.3d 368] (*Garamendi*), which briefly examines subdivision (d)(2). For the reasons that we explain *post*, *Garamendi* does not provide guidance on the issue before us.

In *Garamendi*, a public interest group filed a petition for writ of mandate and complaint to invalidate legislation regulating insurance companies. (*Garamendi, supra*, 132 Cal.App.4th at pp. 1379–1380.) An insurer subsequently intervened in the action and filed an anti-SLAPP motion against the complaint, which contained references to the insurer's political contributions, but did not assert any claims against the insurer. (*Id.* at p. 1380.) The trial court denied the anti-SLAPP motion as frivolous, concluding, inter alia, that the action fell within the "public interest" exception in section 425.17. (*Garamendi, supra*, at p. 1385.)

On appeal, the court in *Garamendi* rejected the insurer's contention that its political contributions constituted political "works" within the meaning of subdivision (d)(2), reasoning without supporting analysis that this subdivision applies only to actions involving a "work of a kind that might be subject to copyright protection." (*Garamendi, supra*, 132 Cal.App.4th at p. 1391.) Although we agree that political contributions do not constitute political "works," we find no basis for the *Garamendi* court's reference to copyright principles in the language of section 425.17 or its legislative history, which we examine in the text. Because the *Garamendi* court did not confront the issue presented here, and its remarks regarding copyright protection constitute dicta, we respectfully reject any suggestion in these remarks that the issue before us is properly resolved by reference to copyright law.

Cal.Rptr.2d 671, 927 P.2d 1175].) California courts have "scrupulously honored this principle" in interpreting the anti-SLAPP law. (See *ibid.*)

■ Precisely stated, the question before us concerns the scope of the "public interest" exception to the anti-SLAPP law, given the qualification on this exception in subdivision (d)(2). Generally, exceptions to a statute are construed narrowly to cover only situations that are "within the words and reason of the exception." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 20 [22 Cal.Rptr.2d 229].)

We conclude that Major's action falls outside the "public interest" exception. Subdivision (d)(2), by its plain language, exempts from this exception "[a]ny action against a person . . . based upon the . . . dissemination . . . or other similar promotion of any . . . political . . . work . . . ." Here, it is undisputed that Silna mailed letters supporting political candidates, and Major sought an injunction to prevent Silna from engaging in such mailings and paying for political advertisements.

The key question, therefore, is whether Silna's letters and advertisements constitute "works" within the meaning of subdivision (d)(2). The word "work," as ordinarily understood, means "something produced or accomplished by effort, exertion, or exercise of skill," or "something produced by the exercise of creative talent or expenditure of creative effort." (Merriam-Webster's Collegiate Dict. (10th ed. 1995) p. 1363.) However, because the Legislature has accompanied this word with descriptive terms and illustrative examples, our inquiry into its scope is guided by the doctrine of *ejusdem generis*.

■ "Meaning literally, 'of the same kind,' the doctrine of *ejusdem generis* is of ancient vintage. [Citation.]" (*Engelmann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 56, fn. 11 [3 Cal.Rptr.2d 264].) As our Supreme Court explained in *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 141 [96 Cal.Rptr.2d 485, 999 P.2d 718], " '[e]*jusdem generis* applies whether specific words follow general words in a statute or vice versa. In either event, the general term or category is "restricted to those things that are similar to those which are enumerated specifically." ' [Citation.] The canon presumes that if the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples peculiar things or classes of things since those descriptions then would be surplusage. [Citation.]"[6]

---

[6] Closely related to this doctrine are the doctrines of *expressio unius est exclusio alterius*, and *noscitur a sociis*. "*Expressio unius est exclusio alterius* means that 'the expression of certain things in a statute necessarily involves exclusion of other things not expressed. . . .' [Citation.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379,

In applying this doctrine, we seek an interpretation of subdivision (d)(2) that respects its plain language, harmonizes the provisions of the pertinent statutes, and promotes the goals of the anti-SLAPP law. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at pp. 1386–1387, 1390–1391.) In addition, "[b]oth the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Id.* at p. 1387.)

Here, subdivision (d)(2) encompasses "any dramatic, literary, musical, political, or artistic work, including, but not limited to, a motion picture or television program, or an article published in a newspaper or magazine of general circulation." The phrase "including, but not limited to" is a term of enlargement, and signals the Legislature's intent that subdivision (d)(2) applies to items not specifically listed in the provision. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at pp. 1389–1391.)

■ Viewed in the context of the anti-SLAPP law, Silna's letters and advertisements are not different in kind from the illustrative examples identified in subdivision (d)(2). We do not see any material distinction between Silna's letter—which advocated support for the candidates on the basis of their political positions, and was distributed by mail in Malibu—and an article or editorial of similar length and content in a newspaper or magazine circulated generally in Malibu. Silna's letters (and advertisements) are indistinguishable from the aforementioned article or editorial as "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

Our conclusion finds additional support in the Legislature's declaration regarding the enactment of section 425.17. The Legislature states in subdivision (a) of section 425.17: "[T]here has been a disturbing abuse of Section 425.16, the California Anti-SLAPP Law, which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process or Section 425.16."

As we have indicated (see pt. A., *ante*), political literature on candidate qualifications exemplifies "[t]he right to speak on political matters," which is

1391, fn. 13 [241 Cal.Rptr. 67, 743 P.2d 1323].) Furthermore, "[u]nder the rule of *noscitur a sociis*, ' "the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used." ' [Citations.]" (*Id.* at p. 1391, fn. 14.)

"the quintessential subject" of constitutional free speech rights. (*Matson v. Dvorak, supra*, 40 Cal.App.4th at p. 548.) We therefore conclude that the Legislature did not intend to exclude such literature from the political works denoted in subdivision (d)(2), given the Legislature's goal of reaffirming the anti-SLAPP law as a protector of free speech rights through the enactment of section 425.17.

Pointing to the legislative history of section 425.17, Major contends that the Legislature intended that subdivision (d)(2) would exempt only the news media and other media defendants from the "public interest" exception. We are not persuaded. As we explain *post*, the legislative history before us corroborates our conclusions about subdivision (d)(2).[7]

This legislative history discloses that corporations were the principal source of the "disturbing abuse" of the anti-SLAPP law cited in subdivision (a) of section 425.17. Section 425.17 originated as Senate Bill No. 515 (2003–2004 Reg. Sess.), which was enacted in September 2003. (Stats. 2003, ch. 338, § 1.) An early Senate Committee analysis of this bill identifies its sponsor as the Consumer Attorneys of California, who contended that "a growing number of large corporations ha[d] invoked the anti-SLAPP statute to delay and discourage litigation against them by filing meritless SLAPP motions, using the statute as a litigation weapon." (Sen. Com. on Judiciary, com. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 5.)[8]

According to this Senate Committee analysis, the exceptions to the anti-SLAPP law in subdivisions (b) and (c) of section 425.17 were intended to end this corporate abuse. (Sen. Com. on Judiciary, com. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, pp. 6–7.) The analysis further states that "[p]roposed subdivision (d) of newly added Section 425.17 would exempt the news media and other media defendants (such as the motion picture industry) from the bill when the underlying act relates to news gathering and reporting to the public with respect to the news media or to

---

[7] We have taken judicial notice of items of this legislative history at Silna's request. (Evid. Code, §§ 452, subd. (c), 459; *Martin v. Szeto* (2004) 32 Cal.4th 445, 452, fn. 9 [9 Cal.Rptr.3d 687, 84 P.3d 374].)

[8] The Senate Committee analysis states that Senate Bill No. 515 was intended to overrule *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562 [92 Cal.Rptr.2d 755]. (Sen. Com. on Judiciary, com. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 6.) In that case, the plaintiffs brought a class action against a drug manufacturer, asserting claims under the California Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) and the California Unfair Practices Act (Bus. & Prof. Code, § 17500). (*DuPont Merck Pharmaceutical Co. v. Superior Court, supra*, 78 Cal.App.4th at p. 564.) The court in *DuPont Merck* held that the drug manufacturer was entitled to file an anti-SLAPP motion in the action. (*Id.* at pp. 565–568.)

activities involving the creation or dissemination of any work of a motion picture or television studio." (*Id.*, p. 14.)

However, subsequent analyses depict the scope of this subdivision in more expansive terms. An Assembly Committee report states that the subdivision would permit "the anti-SLAPP motion to be employed against claims arising from gathering, receiving or processing information for communication to the public by a publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, press association or wire service, . . . *or an action based upon the creation or promotion of a dramatic, literary, musical, political or artistic work.*" (Assem. Com. on Judiciary, com. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, p. 3, italics added.) It further indicates that the subdivision in question excludes "specified persons and entities, such as those engaged in *speech-related activities,* specified nonprofits, and *actions against persons* or entities *based on the creation or promotion of constitutionally protected artistic works and the like.*" (*Id.*, p. 12, italics added.) Similar remarks are found in a later report. (Assembly Floor Analysis, 3d reading analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended July 8, 2003, pp. 1–2.)

The aforementioned analyses reinforce our conclusions regarding subdivision (d)(2). They disclose that the Legislature's goal in enacting section 425.17 was to limit *corporate* abuse of the anti-SLAPP law, and not to exclude individuals who have distributed political literature from the scope of the anti-SLAPP law. To curb corporate abuse, the Legislature enacted the "public interest" exception to the anti-SLAPP law in section 425.17. However, this exception—as stated in subdivision (b) of section 425.17—is not facially limited to public interest actions against corporations. Accordingly, the Legislature checked the reach of the "public interest" exception by enacting subdivision (d)(2), which preserves the application of the anti-SLAPP law to actions against individuals that implicate important forms of protected speech.

In sum, Major's action falls outside the "public interest" exception to the anti-SLAPP law.

### C. *Silna's Anti-SLAPP Motion*

The remaining issue is whether Silna is entitled to a fee award because his anti-SLAPP motion should have been granted. As we have explained (see pt. A., *ante*), actions arising from the distribution of political literature during an election are within the scope of the anti-SLAPP statute. Accordingly, the

burden fell upon Major to demonstrate a probability that he would prevail on his claims for injunctive relief. We conclude that he failed to carry this burden.

Major's burden resembles that imposed on a plaintiff opposing a motion for summary judgment on his complaint. (*Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 768 [131 Cal.Rptr.2d 201].) He was obliged to demonstrate that his complaint is "both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted [by Major] is credited." (*Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 548; accord, *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].)

 Generally, to determine whether the party opposing an anti-SLAPP motion has carried this burden, the trial court must consider the party's pleadings and his supporting affidavits, to the extent that these contain admissible evidence. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786].) The trial court is also obliged to consider admissible evidence submitted in support of the motion, but only to determine whether this evidence defeats the opponent's showing as a matter of law. (*Ibid.*) In assessing whether the opponent has carried his or her burden, the trial court is precluded from weighing the evidence or making credibility determinations. (*Ibid.*)

Here, Major and Silna submitted evidence bearing on whether Silna acted independently in mailing his letter, and they raised evidentiary objections to the respective adverse showing. Because the trial court did not reach the merits of Silna's motion, it never ruled on these objections. Nonetheless, as we explain *post,* it is unnecessary for us to address these objections or the showings on Silna's independence.

 In our view, Major lacked standing to seek injunctive relief, and thus his action was not "legally sufficient." (*Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 548.) At the outset, we observe that citizens of a municipality ordinarily have limited standing to enjoin violations of a municipal ordinance, absent authorization in the ordinance itself. Civil Code section 3369 provides that "[n]either specific nor preventive relief can be granted . . . to enforce a penal law, except in a case of nuisance or as otherwise provided by law." Civil Code section 3493 further provides that "[a] private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise."

In view of these provisions, courts have generally permitted a citizen to enjoin violations of local ordinances only when the violations work a special

injury on the citizen. (E.g., *Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994) 24 Cal.App.4th 1036, 1039–1043 [29 Cal.Rptr.2d 664] [injunctive relief regarding airport fuel tanks alleged to violate county ordinances is properly denied due to failure to show special injury]; *Taliaferro v. Salyer* (1958) 162 Cal.App.2d 685, 691 [328 P.2d 799] ["In order to state a cause of action based upon a violation of the building code, plaintiff must show that he has suffered some exceptional damage other than that suffered by the public generally"]; *Stegner v. Bahr & Ledoyen, Inc.* (1954) 126 Cal.App.2d 220, 231–232 [272 P.2d 106] [violation of zoning ordinance carrying criminal penalties does not support injunctive relief]; *Perrin v. Mountain View Mausoleum Assn.* (1929) 206 Cal. 669, 674 [275 P. 787] [violations of county ordinances alone do not support injunctive relief against operation of mausoleum]; but cf. *Sapiro v. Frisbie* (1928) 93 Cal.App. 299, 305–313 [270 P. 280] [homeowner may enjoin violation of a zoning ordinance without a showing of special injury, on theory that the zoning ordinance extends special protection to all homeowners].)

Here, Major does not allege any special injury, and thus the key issue is whether Malibu's campaign finance law *itself* accords him standing to seek injunctive relief. Because a regulatory statute does not invariably create a private right of enforcement, we examine the language of this law and its legislative history to determine whether Malibu intended to authorize Major's action. (See *Vikco Ins. Services, Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 62 [82 Cal.Rptr.2d 442].)

Here, section 2.20.070(A) of the MMC provides that violations of the campaign finance law may be punished as misdemeanors, but accords the city prosecutor the discretion to charge such violations as infractions.[9] Furthermore, section 2.20.070(B) states: "The city prosecutor may sue for injunctive relief to enjoin violations and to compel compliance with the provisions of this chapter either upon their own initiative or upon the complaint of any interested party. No civil action alleging a violation of this chapter may be filed against a person pursuant to this section if the criminal prosecutor is maintaining a criminal action against that person pursuant to subsection A of this section."

---

[9] Section 2.20.070(A) of the MMC provides in full: "Any person or candidate or committee or person exhibiting a significant amount of control over the actions, expenditures or decisions of such committee or candidates for elective office who violates any provision of this title is guilty of a misdemeanor and upon conviction is punishable by a fine not exceeding one thousand dollars ($1,000.00), or by imprisonment in the county jail for a period not exceeding six months, or by both such fine and imprisonment, unless such violation is subsequently prosecuted as an infraction in the discretion of the city prosecutor in which case such person is guilty of an infraction punishable as provided in Section 1.16.010(B)."

Section 2.20.070(B) of the MMC does not expressly authorize injunctive actions by parties other than the city prosecutor. Before the trial court, Major nonetheless contended that the second sentence of this section impliedly accords him standing to enjoin Silna's alleged violations. As we explain *post*, neither Malibu's campaign finance law—viewed in its entirety—nor the history of this law supports this contention.

We begin by examining the second sentence of section 2.20.070(B) of the MMC and its function within that section. This sentence, on its face, bars the city prosecutor from pursuing an action for injunctive relief against a violator when a criminal action is also pending against the violator. It closely tracks a portion of Government Code section 91005.5, which permits city attorneys and other public officials to seek penalties of up to $5,000 in civil actions for enumerated violations of the PRA, but bars such actions when a criminal action is also pending under Government Code section 91000, which authorizes criminal penalties in excess of $10,000.[10]

In imposing the aforementioned restriction, Government Code section 91005.5 states: "No civil action alleging a violation of this title may be filed against a person pursuant to this section if the criminal prosecutor is maintaining a criminal action against that person pursuant to Section 91000." Government Code section 91005.5 thus limits the power of a city attorney—who may act as the "criminal prosecutor" under PRA (Gov. Code, § 91001.5)—to obtain civil and criminal penalties for a single violation of the PRA.

The similar restriction in section 2.20.070(B) of the MMC is reasonably viewed as addressing a different—but related—concern. In *People v. Lim* (1941) 18 Cal.2d 872, 880 [118 P.2d 472], our Supreme Court explained that issues of due process are raised when a public official initiates an action for injunctive relief against a party who also faces a criminal action for the same conduct. In such cases, "the equitable remedy has the collateral effect of depriving a defendant of the jury trial to which he would be entitled in a criminal prosecution for violating exactly the same standards of public policy. [Citations.] The defendant also loses the protection of the higher burden of proof required in criminal prosecutions and, after imprisonment and fine for

---

[10] Government Code section 91005.5 provides in full: "Any person who violates any provision of this title, except Sections 84305, 84307, and 89001, for which no specific civil penalty is provided, shall be liable in a civil action brought by the commission or the district attorney pursuant to subdivision (b) of Section 91001, or the elected city attorney pursuant to Section 91001.5, for an amount up to five thousand dollars ($5,000) per violation. [¶] No civil action alleging a violation of this title may be filed against a person pursuant to this section if the criminal prosecutor is maintaining a criminal action against that person pursuant to Section 91000. [¶] The provisions of this section shall be applicable only as to violations occurring after the effective date of this section."

violation of the equity injunction, may be subjected under the criminal law to similar punishment for the same acts." (*Ibid.*) The *Lim* court thus stated that actions for injunctive relief against a person who also faces criminal penalties are not authorized "in the absence of a legislative declaration to that effect[.]" (*Ibid.*) The second sentence of section 2.20.070(B) appears to address these matters by barring the city prosecutor from pursuing simultaneous equitable and criminal actions against the same violator.

Nothing in Malibu's campaign finance law otherwise suggests an intent to permit private enforcement actions. Unlike the PRA, which expressly declares that its goals include the provision of "[a]dequate enforcement mechanisms . . . to . . . private citizens in order that [the PRA] will be vigorously enforced" (Gov. Code, § 81002, subd. (f)), Malibu's campaign finance law states only that it is intended to ensure "full and fair enforcement" of its provisions (MMC, § 2.20.010). Furthermore, whereas the PRA contains provisions *expressly* authorizing private enforcement actions (Gov. Code, §§ 91003, subd. (a), 91004, 91005, subd. (a)), Malibu's campaign finance law contains only section 2.20.070(B) of the MMC, which—as we have noted—lacks any express reference to private enforcement actions.

Finally, the history of Malibu's campaign finance law indicates that it has never authorized private enforcement actions. As enacted in 1993, the law contained a provision that rendered violations punishable as misdemeanors, without referring to the public officials responsible for initiating criminal actions. A separate provision addressing injunctive relief consisted of a single sentence: "The District Attorney or the Attorney General of the State of California may sue for injunctive relief to enjoin violations and to compel compliance with the provisions of this Chapter either upon their own initiative or upon the complaint of any interested party." In 1999, Malibu amended these provisions by (1) including a reference to the city prosecutor in the provision regarding criminal penalties, (2) substituting the city prosecutor for the public officials originally identified in the provision regarding injunctive relief, and (3) adding to the latter provision the sentence that we have been examining.

The history of the law thus corroborates our conclusion that it does not authorize private enforcement actions. Since its inception, only public officials have been expressly empowered to enforce it. Furthermore, it has been amended solely to limit the public officials permitted to initiate enforcement actions.

On appeal, Major contends that the PRA authorizes his action. He places special emphasis on the express affirmation in the PRA—which we have already discussed—that its goals include the provision of "[a]dequate enforcement mechanisms" to private citizens. (Gov. Code, § 81002, subd. (f).)

However, the PRA does not establish any enforcement mechanism for Malibu's campaign contribution limit.

The relevant portions of Malibu's campaign finance law are independent of the PRA. Malibu's law was enacted pursuant to Government Code section 81013[11] and Elections Code section 10202,[12] which jointly permit local governments to establish limitations on campaign contributions in municipal elections beyond those found in the PRA, provided that these limitations are consistent with the PRA.

The provisions of the PRA that authorize private enforcement actions, on their face, are limited to violations of the PRA. (Gov. Code, §§ 91003, subd. (a),[13] 91004,[14] 91005, subd. (a)[15]). Although the PRA bars *cash* contributions exceeding $100 and imposes reporting requirements on contributions that are greater than $100 (Gov. Code, § 84300[16]), it does not contain Malibu's per se ban on contributions exceeding $100. Accordingly, violations

---

[11] Government Code section 81013 provides: "Nothing in [the PRA] prevents the Legislature or any other state or local agency from imposing additional requirements on any person if the requirements do not prevent the person from complying with [the PRA]. If any act of the Legislature conflicts with the provisions of [the PRA], [the PRA] shall prevail."

[12] Elections Code section 10202 provides: "A city may, by ordinance or resolution, limit campaign contributions in municipal elections."

[13] Government Code section 91003, subdivision (a), provides in pertinent part: "Any person residing in the jurisdiction may sue for injunctive relief to enjoin violations or to compel compliance with the provisions of this title."

[14] Government Code section 91004 provides: "Any person who intentionally or negligently violates any of the reporting requirements of this title shall be liable in a civil action brought by the civil prosecutor or by a person residing within the jurisdiction for an amount not more than the amount or value not properly reported."

[15] Government Code section 91005, subdivision (a), provides: "Any person who makes or receives a contribution, gift, or expenditure in violation of Section 84300, 84304, 86203, or 86204 is liable in a civil action brought by the civil prosecutor or by a person residing within the jurisdiction for an amount up to one thousand dollars ($1,000) or three times the amount of the unlawful contribution, gift, or expenditure, whichever amount is greater."

[16] Government Code section 84300 provides: "(a) No contribution of one hundred dollars ($100) or more shall be made or received in cash. [¶] A cash contribution shall not be deemed received if it is not negotiated or deposited and is returned to the contributor before the closing date of the campaign statement on which the contribution would otherwise be reported. If a cash contribution, other than a late contribution, as defined in Section 82036, is negotiated or deposited, it shall not be deemed received if it is refunded within 72 hours of receipt. In the case of a late contribution, as defined in Section 82036, it shall not be deemed received if it is returned to the contributor within 48 hours of receipt. [¶] (b) No expenditure of one hundred dollars ($100) or more shall be made in cash. [¶] (c) No contribution of one hundred dollars ($100) or more other than an in-kind contribution shall be made unless in the form of a written instrument containing the name of the donor and the name of the payee and drawn from the account of the donor or the intermediary, as defined in Section 84302. [¶] (d) The value of all in-kind contributions of one hundred dollars ($100) or more shall be reported in writing to the recipient upon the request in writing of the recipient."

of this per se ban fall outside the scope of the enforcement mechanisms established under the PRA.

Because Major's action fails as a matter of law on undisputed facts, Silna's anti-SLAPP motion must be granted. We therefore remand the matter to the trial court for a determination of the fees and costs to be awarded to Silna.

## DISPOSITION

The order denying an award of attorney fees and costs is reversed, and the matter is remanded to the trial court for further proceedings in accordance with this opinion. Appellant is awarded his costs and fees on appeal. (*Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497 [45 Cal.Rptr.2d 624].)

Epstein, P. J., and Hastings, J., concurred.